State of Missouri v. Burns.

THE STATE OF MISSOURI, Respondent, *v.* JOSEPH BURNS, Appellant.

*Practice, criminal—Jury.*—The rule in capital cases forbidding the jury to separate, applies only to the jury when duly empannelled, sworn and charged with the case.

*Evidence—Dying declarations.*—Whether the declarations made *in extremis* are competent evidence or not, is a question for the court and not the jury.

*Appeal from St. Louis Criminal Court.*

*Kribben,* for appellant.

I. The defendant having been put upon his trial under a charge of murder, and nine jurors having been selected and accepted both on the part of the State and himself, it was error on the part of the court to permit the men so passed upon and accepted to separate unconditionally in order to await the filling up of the panel on the following day. (1 Gra. & Wat. on New Trials, 62, and notes; Commonwealth v. McCaul, 1 Va. Cases, 271–288; 1 Conn. 401.)

Every principle laid down in the above cited authorities respecting jurors sworn, applies with redoubled force to men sworn on their *voir dire* before being sworn in chief, the object of the law in keeping jurors confined, in capital cases, being solely to keep them free from outside influences. The very fact of their being accepted and selected as jurors is well calculated to prevent the objects sought to be attained by permitting their separation.

II. In a capital case, it matters not whether the defendant chose to take advantage of the error of the court in this respect by excepting to the panel on the following day, when the jury were finally sworn. The whole system of criminal

jurisprudence and practice supports this assumption. (Pfeiffer v. The Commonwealth, 3 Harris, Pa., 468; Cochran v. The State, 7 Humph. 544; Hines v. The State, 8 id. 599; McLain v. The State, 10 Yerg. 241; McCann v. The State, 9 S. & M. 465; Bowles v. The State, 13 id. 398; Cornelius v. The State, 7 Eng., Ark., 782.)

III. The court should have granted the several instructions asked by defendant concerning dying declarations. (1 Green. Ev. 156, et seq.; Starkey v. The People, 17 Ill. —.)

IV. The third instruction asked for the defendant, in words following—" A mere suspicion on the part of a police officer that certain parties are generally believed to be burglars, thieves, or the like, does not warrant such officer to arrest; and if, in the attempt to arrest any person who is not shown to have been guilty of some felony, or respecting whose guilt there are not reasonable grounds, the killing of such officer in the attempt to resist such arrest is not murder"—should have been granted; and the granting by the court of the instructions contradictory of the principle stated above was error and vitiates the verdict, the instructions given on that point being calculated to mislead the jury by assuming facts.

There must, under all circumstances, be reasonable ground on the part of the officer attempting the arrest of a person, that that person had been guilty of a particular felony, in order to constitute the homicide, committed in attempting to resist such arrest, murder; a mere general evil report that the party sought to be arrested was a notoriously bad character not warranting a forcible arrest.

*Voullaire*, for respondent.

The only point that can be raised is, whether the judge erred in dismissing, on one occasion upon the adjournment of the court, such persons as had been examined and accepted to serve as jurors, until the succeeding morning at the meeting of the court, and permitting said persons, with others, to be sworn as jurors in another case and try the same.

I. Said persons so accepted were not as yet jurors in the case.

State of Missouri v. Burns.

A juror is a citizen, duly qualified, legally summoned, empannelled, charged and sworn to try one or more issues of facts submitted to him and his co-jurors, and to give a judgment respecting the same. These persons so accepted had not been charged nor sworn to try the case; therefore there was no necessity to keep them together, &c. (Whart. Crim. Law, 273; Tool v. Com., 11 Leigh, 714; 1 Burr's Trial, 382; Epes' case, 5 Grat. 681; Hines v. State, 8 Humph. 599; Martin's case, 2 Leigh, 750; Rex v. Wolff et al., 1 Chit. 406, 419, &c.; State v. McKee, 1 Baily, 651; State v. Miller, 1 Dev. & Bat. 509, &c.; State v. Benket et al., 2 Mills' Const. 155, s. p.; Whar. Crim. Law, 1012, &c.; State v. Babcock, 1 Conn. 401.)

II. Defendant, at any time before they were sworn, could have excused them to the number of his peremptory challenges. (Whart. Crim. Law, 971; 5 Leigh, 715, Hendricks' case; State v. Cameron, 2 Chand., Wis., 181; Morris v. State, 7 Blackf. 608; Manly v. State, 7 Blackf. 593; Hooker v. State, 4 Ohio, 350, and authorities therein cited; Beauchamp v. State, 6 Blackf. 307; Williams v. State, 3 Geo. 459.)

BAY, Judge, delivered the opinion of the court.

The defendant and one Wilson were indicted at the March term, 1862, of the St. Louis Criminal Court, for the murder of John C. Gilmore, a police officer of the city of St. Louis. A severance being had, the defendant was tried at the July term following, and convicted of murder in the first degree, and sentenced to be executed. From this judgment he appeals to this court.

For the purposes of this case, it is unnecessary to give more than a mere outline of the testimony, as the main ground relied upon for a reversal has no reference to the evidence. In December, 1861, and about two o'clock at night, a burglary was committed upon the premises of a man by the name of Doctor, at the corner of Jefferson and Ninth streets, in St. Louis. Doctor being aroused by the noise, encountered one of the burglars, who knocked him down, and who afterwards

proved to be Wilson. Doctor states that another man accompanied Wilson, as he distinctly heard him say, " you damned son of a bitch, if you don't shut your mouth we will blow your brains out." He did not see him so as to be able to recognize him. Shortly after the disappearance of the burglars, he roused some of his neighbors and got one of them to fire off a pistol, to attract the attention of the police. The deceased, in company with Bruder and Johnson, also policemen, soon came up, and Doctor informed them of what had transpired, describing the men as near as he could do so, and giving in detail the particulars of the robbery. Gilmore immediately said, " that is Wilson and Burns;" and about six o'clock of the same morning, in company with policeman Jacobs, went to the house of Wilson and Burns to arrest them, they living together with two disreputable women on Chambers street, near Thirteenth. Not finding them at home, Gilmore told Jacobs, who resided near by, to go and get his breakfast and return. Jacobs did so, and returned in about ten minutes. While away, he heard the report of a pistol and immediately ran round Chambers street to Thirteenth, when he saw deceased running up Thirteenth towards Madison street, and as he approached him, deceased said, " Oh, Jacobs, I am shot." Deceased had his "star" on the left breast outside of his coat; deceased was wounded in the left jaw, and was bleeding from the mouth and jaw; deceased had a Colt's revolver; witness examined it and found all the chambers loaded, and with unexploded caps on them.

Two other witnesses testified that, about seven o'clock on the morning of the 10th December, they heard the report of a pistol, which came from the house of Wilson and Burns, both of whom were well known to witnesses, and immediately afterwards Wilson ran out of the house and through the gate to the pavement; stood still for a few seconds, looking back at the house with a smile on his face; Burns then came out of the house, having hold of deceased, with his left hand round his neck from behind, and holding deceased's right arm by the elbow, and after passing through the gate, threw the

deceased down on some curbstones lying upon the sidewalk, and then Wilson and Burns started off; deceased, who was bleeding from the mouth, arose and ran up the street for about fifty feet, and commenced staggering, and was then taken care of by Jacobs and some other friends.

Gilmore died on the 24th of December from the wounds received, and during his confinement expressed a firm belief that his wounds were mortal, and that he must die. On the shoulder of deceased was also found a black spot indicative that he had received a blow from a slung shot, or other blunt instrument. Wilson and Burns were afterwards arrested in the State of Pennsylvania and brought to St. Louis.

The main ground of error relied upon by the prisoner's counsel relates to the empannelling of the jury. It seems from the bill of exceptions that the regular panel was exhausted without being able to obtain more than ten who were competent to serve as jurors, whereupon the court ordered a venire to issue for an additional number, and while the officer was engaged in executing the writ the court proceeded with other business, and tried another case on the same day, the ten veniremen, selected as aforesaid, forming a part of the jury. Upon the conclusion of the case, the writ of venire was returned and two additional jurors selected, making the panel complete, and the usual time of adjournment having arrived, the court discharged the jurors until the following morning, with the usual injunction not to speak to any person about the case, nor to allow any person to approach them concerning it. They had not yet been sworn or empannelled, nor was any objection to this course made by the prisoner or his counsel.

It is contended by the prisoner's counsel that in permitting them thus to separate, the court below committed an error which vitiates the verdict. Being desirous of giving the defendant the full benefit of this objection, we have examined with much care all the authorities cited by his counsel, but have been unable to find a single case which supports the objection.

In Pfeiffer v. The Commonwealth of Pennsylvania, (3 Har. 468,) the verdict was set aside because the jury separated after they had been sworn and empannelled. C. J. Gibson, in delivering the opinion of the court, said : " A juror is charged with a prisoner as soon as he has looked upon him and taken the oath ; for he cannot be withdrawn ; the trial has commenced, and the prisoner stands before him as one of his judges."

The cases cited in 7 and 8 Humphrey also refer to the conduct of the jury after being sworn and charged.

In McLain v. The State, (10 Yerg. 241,) the separation took place not only after the jury were sworn, but after hearing a part of the evidence.

In McCann v. State, (9 Sm. & Marsh. 465,) the judgment was reversed because the jury for a portion of the time during the trial, and after their retirement, were not under the care and charge of a sworn officer of the court.

In Boles v. The State, (13 Sm. & Marsh, 398,) the verdict was set aside because persons not of the jury were permitted to visit and mingle with the jury after the cause had been submitted to them, and they had retired to consider of their verdict.

In Cornelius v. The State, (7 Eng., Ark., 782,) some of the jurors, after the commencement of the trial, were seen walking in the street.

These cases, cited by the learned counsel for the prisoner, relate to misconduct of the jury after being sworn and empannelled, and in some of them after hearing a portion of the evidence ; they therefore furnish no authority in favor of the ground taken by the prisoner, for in the case at bar neither of the veniremen had been sworn, and were still subject to challenge.   In fact, they were not yet jurors, and not therefore in the custody of any officer of the court.   Though selected by both State and prisoner, they were not clothed with the power and authority of a jury, but were still subject to be set aside, excused or challenged.

Wharton, in his Treatise on Criminal Law, p. 273, says,

State of Missouri v. Burns.

"until the jury are sworn it is not necessary that they should be kept together," and cites numerous cases in which it has been so ruled. In Epes' case, (5 Grat. 676,) the prisoner was convicted of murder in the first degree; several days were consumed in making up the panel, and the jurymen were not committed to the keeping of the sheriff in the interval between the time of their selection and the time they were sworn; held by the General Court of Virginia, that there was no necessity for delivering the jurymen, who had been or should be sworn, into the custody of the marshal, until the whole number had been empannelled and sworn. The same doctrine was held in Todd's case, (11 Leigh, 714,) and by C. J. Marshall in Burr's case, and is fully supported by numerous other cases, both in England and this country.

We are therefore of the opinion that the separation of the veniremen in this case, before being sworn and empannelled, furnishes no ground for a new trial.

We have carefully examined the instructions given by the court, and, with the exception of one or two, they are such as are usually given in cases of homicide, and have been time and again approved of by this court. The defendant asked several instructions, which were refused—some of which were very properly refused—while others which were unobjectionable were substantially given in the instructions framed by the court. In the argument, particular complaint is made because the defendant's fifth instruction was refused. The instruction is as follows:

"If the jury believe that the dying declarations of Gilmore were not made *in extremis*, and not at a time and under circumstances when the said Gilmore was impressed with the conviction of death resulting from the illness with which he was then confined, then the jury will discard such declarations, although they believe the evidence in respect thereto to be true."

This instruction was very properly refused, for it left it to the jury to pass upon the admissibility of the declarations, a question solely for the consideration of the court and not for

the jury. As stated by Greenleaf, in his work on Evidence, vol. 1, p. 213, it is placed on the same ground with the preliminary proof of documents, and of the competency of witnesses, which is always addressed to the court.

The court, however, will look at the preliminary proof to ascertain if the declarations were properly admitted. One of the witnesses who visited him frequently during his illness, told him he thought he would recover. Deceased stated in reply that he would not recover; that he was a dead man anyhow; that he could not survive, and that he felt that he was mortifying; that he only regretted it on account of his children and family, and that he did not like to speak before his wife of his approaching death. It was also shown that he never entertained the slightest hope of a recovery, but labored under a settled conviction that his death was near at hand.

It is difficult to imagine a stronger case than this for the admission of dying declarations. Upon the whole case, we think the defendant has no reason to complain of the ruling of the court below. He was defended by able counsel; received a fair and impartial trial, and obtained the full benefit of every principle of law which could be invoked in his behalf. We do not, therefore, feel at liberty to interfere with the verdict.

The other judges concurring, the judgment will be affirmed.