. THE STATE v. LOUIS ZORN, Appellant.

**Division Two, March 5, 1907.**

1. **EXCLUSION OF EVIDENCE: Not Set Out: Infidelity of De-
clarant.** Where it is insisted on appeal that the trial court
committed error in excluding certain testimony tending to show
that deceased was an infidel, it is necessary that the record
disclose the testimony along that line appellant proposed to
introduce. Where the testimony offered has no tendency to
show that deceased was an infidel, it is not admissible as affect-
ing the weight which should be given to his dying declaration.

2. **TURBULENCY OF DECEASED: Reputation: Admissible Evi-
dence.** Where a homicide occurs under such circumstances
that it is doubtful whether the act was committed maliciously
or from a well-grounded apprehension of danger, testimony
tending to show that the deceased was a turbulent, violent or
desperate man is always admissible, in order to determine
whether defendant had reasonable cause to apprehend great
personal danger to himself.

3. ———: ———: ———: **When Defense of Self-Defense is De-
veloped.** Where the defense of self-defense is relied upon, and
has been sufficiently developed to inform the court that that is
the defense relied upon, it is proper to admit testimony tend-
ing to show that deceased was a turbulent, violent or desperate
man. And where there is evidence tending to show that at
the time the shot was fired deceased was in a threatening atti-
tude, with a dangerous weapon in his hand and in the act of
striking defendant, testimony as to deceased's reputation for
turbulency is admissible as soon as it develops that the defense
of self-defense is relied upon—if not so developed when of-
fered, then later when it is developed.

4. **DYING DECLARATION: Admissibility: Question for Court.** It
is the province of the jury to determine the credit or weight
to which a dying declaration is entitled. But whether or not it
is a dying declaration made by deceased, and whether or not it
is admissible in evidence, are questions solely for the deter-
mination of the court. It is fundamental, in order for a dying
declaration to be admissible in evidence, that declarant, at the
time he made it, was conscious of impending death; and it is
the exclusive province of the court to determine whether that
condition did actually exist. An instruction which permits the
jury to determine whether the declaration was made under such

State v. Zorn.

circumstances as constituted it a dying declaration, and to determine whether or not it was admissible in evidence, as the instruction in this case does, is manifestly erroneous.

5. ————: ————: ————: **Submitted to Jury: No Error Nevertheless.** But nevertheless, if the court had already ruled it to be a dying declaration and admissible in evidence, the mere fact that the court thereafter erroneously submitted such preliminary question to the jury by an instruction would not of itself constitute reversible error. But that is not this case. Here the court first heard the State's evidence in the absence of the jury, then announced that the court would then hear defendant's evidence or "you can offer it before the jury if you wish." The jury was brought in, and the State's evidence again presented, and the declaration was admitted over defendant's objection. Then defendant offered its evidence on the subject and the State its evidence in rebuttal, and then the court, along with the other instructions, gave one which authorized the jury to determine whether or not there was a dying declaration, and whether or not it was admissible in evidence. *Held*, that the court did not, either by giving this instruction or otherwise, determine whether or not there had been a dying declaration or whether or not it was admissible in evidence, and the error is reversible; for, there being no ruling by the trial court to the effect that the declaration was admissible, this court can make none.

6. ————: **On State's Testimony Alone.** In determining the admissibility of the dying declaration, the court cannot consider alone the prima-facie case made by the State, and exclude all evidence offered by defendant.

7. ————: ————: **Ruling of Trial Court Doubtful.** There should be no guessing or inferences indulged as to whether or not the trial court ruled that a proper foundation had been laid for the introduction of a dying declaration.

8. **MURDER IN SECOND DEGREE: Instruction: Manslaughter.** Where defendant objected to the court giving an instruction on manslaughter in the fourth degree, he cannot complain that the instruction on murder in the second degree ignores the provocation which might have reduced the killing to manslaughter in the fourth degree.

9. ————: ————: ————: **Murder or No Offense.** Where, under the facts developed, defendant was either guilty of murder in the first or second degree, or of no offense because the killing was justifiable in the proper defense of his person, there is no room for instructions on manslaughter in the fourth degree.

10. **IMPERFECT SELF-DEFENSE.** The right of imperfect self-defense can only arise when the defendant at the commencement of the difficulty was the aggressor or wrongdoer.

11. **DYING DECLARATION: Evidence.** Testimony offered at the preliminary inquiry as to the competency of a dying declaration is addressed to the court, and all testimony tending to show the condition of the deceased at the time the declarations were made should be admitted.

12. **REMARKS OF COUNSEL: Fair Trial.** The Supreme Court will reverse a judgment if the attorney for the State has injected a line of argument which makes it apparent that defendant did not get a fair and impartial trial. But timely objections and exceptions must be made to such remarks, and besides if the defendant's counsel provoked them defendant can not complain.

13. **INFORMATION: Grammatical Errors.** The information may sufficiently and fully inform defendant of the nature and cause of the accusation against him, though it may not strictly conform to proper grammatical construction.

Appeal from Jackson Criminal Court.—*Hon. Howard Gray*, Special Judge.

REVERSED AND REMANDED.

*Reed, Yates, Mastin & Howell* for appellant.

(1)   The information is fatally defective, in this, that there is no direct charge that defendant did "discharge and shoot off, upon and against the deceased" the revolver described in the information. State v. Gleason, 172 Mo. 259; State v. Wilson, 172 Mo. 420; State v. Gray, 172 Mo. 430; State v. Gregory, 178 Mo. 48; State v. Reakey, 62 Mo. 40; State v. Fairlamb, 121 Mo. 137; State v. Hayes, 24 Mo. 358; State v. Hardwick, 2 Mo. 226; Jane v. State, 3 Mo. 61; State v. Ferguson, 152 Mo. 92.   (2)   The court erred in submitting the question of the competency of the dying declaration of deceased to the jury. The admissibility of a dying declaration in evidence and its competency as evidence are questions with which the jury has nothing to do.

State v. Burns, 33 Mo. 483; State v. Johnson, 118 Mo. 504; State v. Sexton, 147 Mo. 102; State v. McCanon, 51 Mo. 160; Wharton on Criminal Evidence (9 Ed.), sec. 297; State v. Simon, 50 Mo. 370; State v. Johnson, 76 Mo. 124. (3) The court erred in giving instruction 4 of the first series of instructions, in improperly defining murder in the second degree. State v. Phelps, 76 Mo. 319; State v. Mitchell, 98 Mo. 657; State v. Elliott, 98 Mo. 150; State v. Evans, 124 Mo. 411; State v. Williamson, 16 Mo. 394; State v. Kotobsky, 74 Mo. 247. (4) The dying declaration should not have been admitted in evidence, as it does not appear that deceased thought that he was *in extremis* at the time he made the declaration, and it is shown by the testimony that he had not abandoned all hope of recovery. State v. Simon, 50 Mo. 370; State v. McCanon, 51 Mo. 160; State v. Draper, 65 Mo. 335; State v. Nelson, 101 Mo. 464; State v. Turlington, 102 Mo. 642; State v. Partlow, 90 Mo. 608; State v. Johnson, 118 Mo. 491. (5) The court erred in giving instruction 5 in the first series of instructions for the reason that there was no evidence in the case upon which to base such an instruction. Giving this instruction the court should have given the corollary thereof, that if deceased provoked and began the quarrel without a felonious intent, then he was not deprived of the right of self-defense. The defendant asked the court to instruct on all the law of the case. State v. Partlow, 90 Mo. 608; State v. Gilmore, 95 Mo. 554; State v. Forsythe, 89 Mo. 667; State v. Cable, 117 Mo. 384; State v. Lewis, 118 Mo. 84; State v. Evans, 128 Mo. 406; State v. Rapp, 142 Mo. 443; State v. Hopper, 142 Mo. 478. (6) The court erred in refusing to give defendant's instructions 8 and 11; if they were improper in form, the court should have given proper ones on the points suggested. Authorities cited under point 5; State v. Matthews, 20 Mo. 55; State v. Stonum, 62 Mo. 596; State v. Patrick,

107 Mo. 147; State v. Lowe, 93 Mo. 547; State v. Luke, 104 Mo. 563.   (7)   The court erred in permitting the prosecuting attorney to use improper language in his closing argument to the jury over the objection of defendant.   State v. Pagets, 92 Mo. 300; State v. Woolard, 111 Mo. 248; State v. Lee, 66 Mo. 165; State v. Mobly, 68 Mo. 315; State v. Reed, 71 Mo. 200; State v. Ulrich, 110 Mo. 350; State v. Young, 99 Mo. 666; State v. Fisher, 124 Mo. 460; State v. Bobbst, 131 Mo. 328; State v. Jackson, 95 Mo. 623.   (8)   The separation of one of the jurors from his fellow jurors in the dining-room of the Ashland Hotel during the trial of the cause, and his conversation with a stranger in said dining-room, was sufficient cause for a new trial, and the court erred in overruling defendant's motion for a new trial on that ground.   State v. Gray, 100 Mo. 523; State v. Murray, 91 Mo. 95; State v. Witten, 100 Mo. 525; State v. Schaeffer, 172 Mo. 335; State v. Orrick, 106 Mo. 111.   (9)   During the trial, defendant sought to make an objection to certain testimony then being offered by the State; the court refused to permit defendant in person to make any objections whatever. This was in direct violation of section 22, of the Bill of Rights of the Constitution, which guarantees to every person upon trial in a criminal case, the right to appear and defend both "in person and by counsel"— and also in violation of a like provision of the U. S. Constitution.

*Herbert S. Hadley*, Attorney-General, and *John Kennish*, Assistant Attorney-General, for the State.

(1)   The information is sufficient.   In an indictment charging the crime of murder by shooting, the use of the word "with" in the clause descriptive of the weapon, to-wit, "and with a certain revolving pistol," though unnecessary, does not render the indictment invalid.   State v. Turlington, 102 Mo. 651; State

v. Wilson, 172 Mo. 428; State v. Gregory, 178 Mo. 56; R. S. 1899, sec. 2535. (2) Prejudicial error was not committed by the court in submitting to the jury in instruction 4 the question as to the competency of the dying declaration. When it is sought to offer in evidence a dying declaration in a case of homicide, it is the general practice to offer the preliminary proof as to the competency of such declaration to the court in the absence of the jury. However, the question as to whether or not the jury shall be excluded when the preliminary inquiry is made is "a matter resting in the sound discretion of the court." 4 Ency. of Evid., sec. 2, p. 951. In the case at bar, the court, in the absence of the jury, heard the evidence offered by the State as to the competency of the dying declaration. No evidence was offered by defendant on this preliminary inquiry, although informed by the court at the time that the court would permit him to introduce such evidence then or after the jury was returned into court. The dying declaration was offered in evidence over the objection of defendant. Thereafter, defendant offered evidence tending to prove that deceased was not *in extremis* at the time the dying declaration was made. In said instruction 4 the court declared the law upon the question of the dying declaration. This instruction not only declared the law as to the weight to be given to such testimony, but also required the jury to find the facts making such declaration competent in order that they might consider it as evidence in the case. 1. No objection was made by defendant at the time to the evidence offered by the State tending to prove the competency of the dying declaration, and, therefore, that question is not now before this court for review. 2. If said instruction 4 is subject to criticism, it is because it was too favorable to defendant. After the court had admitted the dying declaration in evidence, the State was entitled to have it considered

as such by the jury (if the jury find it was in fact made by the deceased), without regard to the facts concerning the competency of such declaration. State v. Parker, 172 Mo. 203; State v. Van Sant, 80 Mo. 67; State v. Hendricks, 172 Mo. 670; State v. McCanon, 51 Mo. 160. If error was contained in said instruction 4, it was in submitting to the jury the question of the competency of said dying declaration, and, as such, being error committed in favor of the defendant, is not reversible. R. S. 1899, sec. 2535. (3) The court did not err in admitting in evidence the dying declaration of deceased. The preliminary proof clearly showed that deceased believed that he was *in extremis* when such declaration was made. State v. Craig, 190 Mo. 332; State v. Brown, 188 Mo. 451; State v. Nocton, 121 Mo. 527. Even though deceased may have entertained a hope of recovery after making the declaration, that fact would not render the declaration inadmissible in evidence. State v. Kilgore, 70 Mo. 553. (4) The court did not err in failing to instruct the jury on the defendant's right of imperfect self-defense, nor in giving instruction 5 on behalf of the State. Defendant's right to an instruction on the question of imperfect self-defense could only have been given upon the theory that he was guilty of manslaughter in the fourth degree, and as the defendant expressly objected to the giving of an instruction on that phase of the case, he cannot be heard to complain of an error committed at his instance. "Self-invited error cannot be made the basis for an assignment of error." State v. Cushenberry, 157 Mo. 182; State v. Keele, 105 Mo. 38; R. S. 1899, sec. 2535. (5) Error is assigned because of the action of the court in permitting the prosecuting attorney in his closing argument to argue to the jury as to the trespass of defendant on the premises occupied by deceased. While the entire closing argument of the prosecuting attorney is incorpora-

ted in the bill of exceptions, only such portions as were objected to at the time, and proper exceptions saved, can be reviewed in this court. Setting out the language objected to for the first time in the motion for a new trial is not sufficient. And if defendant's counsel went outside of the record in his argument, he cannot be heard to complain because the prosecuting attorney did likewise in replying thereto. State v. Hyland, 144 Mo. 302; State v. Summar, 143 Mo. 220; State v. Forsyth, 89 Mo. 667; State v. Gartrell, 171 Mo. 489; State v. Hibler, 149 Mo. 78; State v. Barrington, 198 Mo. 23.

FOX, P. J.—This cause is brought to this court by appeal on the part of the defendant from a judgment of conviction of murder in the second degree in the criminal court of Jackson county, Missouri. The information upon which this judgment is predicated was filed by the prosecuting attorney on the 19th day of December, 1903, in the criminal court of that county, charging the defendant, Louis Zorn, with murder in the first degree, for shooting one Albert Sechrest with a pistol on the 24th day of June of that year. As the correctness of this information is challenged by appellant it is well that it be reproduced here. It was as follows:

"State of Missouri, County of Jackson, ss.

"In the Criminal Court of Jackson County, Missouri, at Kansas City, Missouri, September Term, A. D. 1903.

"Now comes Roland Hughes, Prosecuting Attorney for the State of Missouri in and for the body of the County of Jackson, and upon his oath informs the court that Louis Zorn whose Christian name in full is unknown to said prosecuting attorney, late of the coun-

ty aforesaid, on the 23d day of June, 1902, at the County of Jackson, State of Missouri, in and upon one Albert Sechrest then and there being, feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought did make an assault and with a certain revolving pistol, which was then and there loaded with gunpowder and leaden bullets, and by him the said Louis Zorn in his hands then and there had and held and which said pistol he the said Louis Zorn did then and there feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, discharge and shoot off at, upon and against him the said Albert Sechrest and he the said Louis Zorn with the leaden bullets aforesaid out of the pistol aforesaid then and there by force of the gunpowder aforesaid, by the said Louis Zorn so shot off and discharged as aforesaid, then and there feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought did strike, penetrate and wound the said Albert Sechrest in and upon the body of him the said Albert Sechrest, thus and thereby, then and there feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, giving to him the said Albert Secrest with the leaden bullets aforesaid, so as aforesaid discharged and shot off out of the pistol aforesaid, by the said Louis Zorn one mortal wound, of which said mortal wound the said Albert Sechrest from the said 23d day of June in the year aforesaid until the 24th day of June in the year aforesaid, did languish and languishing did live, on which said 24th day of June in the year aforesaid the said Albert Sechrest at the County of Jackson and State of Missouri, of the mortal wound aforesaid, died; and so the prosecuting attorney aforesaid upon his official oath aforesaid, doth say that the said Louis Zorn him the said Albert Sechrest at the County and State aforesaid, in the manner and by the means afore-

said, feloniously, willfully, deliberately, premeditated-
ly, on purpose and of his malice aforethought did kill
and murder; against the peace and dignity of the
State.                    ROLAND HUGHES,

"Prosecuting Attorney.

"State of Missouri, County of Jackson, ss.

"Roland Hughes, prosecuting attorney of Jackson
county, Missouri, being first duly sworn, on his oath
says that the facts set forth in the above and fore-
going information are true according to the best of
his information and belief.        ROLAND HUGHES.

"Subscribed and sworn to before me this 12th day
of December, 1903.         CHARLES V. RENICK,

"Clerk of the Criminal Court.
"By WILLIAM L. McCLANAHAN, Deputy Clerk."

The record discloses that there have been three
trials of this cause. In the first two trials the jury
failed to agree, and on the third trial, at which the
Hon. Howard Gray presided as special judge, and
which was begun on the 11th of July, 1905, the jury
returned a verdict finding the defendant guilty of mur-
der in the second degree and fixed his punishment at
fifteen years in the State penitentiary.

We deem it unnecessary to burden this opinion
with anything like a detailed statement of the testi-
mony of all the witnesses testifying in this cause; to
do so, would require quite a volume. We shall be con-
tent with a mere reference to the testimony and what
facts it tended to establish. This will be sufficient to
enable us to determine the legal propositions present-
ed by the record.

The evidence on the part of the State tended to
show that the defendant, Louis Zorn, lived in a large
brick house on the west side of Prospect avenue, his
yard extending from Eighth to Ninth street; that is,
the house of the defendant faced east on Prospect

avenue, and his yard occupied the east half of the block between Eighth and Ninth street. In the southwest corner of Zorn's property there was located a small cottage, which, with the yard surrounding it, was fenced off from the rest of the Zorn property by a board fence five feet high. This house faced on Ninth street and was occupied by the deceased as a tenant of the defendant. In the rear and a little to the east of the cottage was situated a cistern, on which there was a pump, and a walk led down from the rear of the cottage to the fence at the back of the Sechrest premises, where there was a gate opening into the Zorn yard. The deceased had occupied the cottage as above spoken of for sometime as a tenant of the defendant, but had sometime previous to the 23d of June been notified to vacate. The testimony relied upon by the State consists of the testimony of Mrs. B. R. Bridgeford and J. W. Alexander, together with the dying declaration introduced in evidence and marked "Exhibit B" in the record. This testimony tended to show that on the 23d day of June the defendant, with one of his hired men by the name of Joe Orton, attempted to go upon the Sechrest premises, which was objected to by Mr. Sechrest. According to the dying declaration of the deceased, when the hired man and the defendant, Louis Zorn, came to the gate the deceased told the hired man not to come in; that the defendant Zorn then opened the gate, entered the Sechrest premises, drawing a pistol from his pocket, whereupon Sechrest jumped back and the defendant fired a shot at him which struck the deceased between the seventh and eighth rib, about three inches to the right of the median line, passed through the liver, both walls of the stomach and lodged in the lower part of the pelvic cavity. The deceased was assisted by his wife, who was present at the time, to the front porch of the house, where he remained until the police ambulance came for him and he was removed to St. Joseph's Hospital,

where he died about 2 o'clock the next day. The shooting occurred a little after 5 o'clock on the afternoon of the 23d day of June. The dying declaration of the deceased, which was introduced in evidence, was as follows:

"I, Albert L. Sechrest, realizing that I am about to die, and having given up all hope of recovery, make this statement about the trouble during which Dr. Zorn shot me this afternoon. The hired man came to the gate; I told him not to come in; Mr. Zorn opened the gate and stepped inside; he ran his hand in his pocket and drew a pistol; I jumped back and he pointed the pistol at me and shot; I had no weapon of any kind in my hand; I did not attempt to strike him with any club, or other weapon; the hired man did not come inside; I make this statement realizing that I am mortally wounded and I have no hope of recovery.

"A. L. SECHREST.

"E. E. GRAY,
  "June 23, 1902."

Mrs. B. R. Bridgeford, one of the witnesses for the State, substantially testified as follows: That she was the wife of B. R. Bridgeford, a livestock dealer at the Kansas City stock yards; that she was sitting at her upstairs window across the street from which she could see the back yard of the Sechrest premises; that she could see the pump therein and a small portion of the rear fence; that her attention was attracted by a pistol shot, and she looked up and saw in the Sechrest back yard between the pump and the rear fence, nearer the pump than the fence, three forms, two men and a woman, and saw a puff of smoke rising as from the shot of a pistol; that she saw one of the men clasp his hands on his stomach, and that this man, as she afterwards learned, was Mr. Sechrest; that she did not see Mr. Sechrest have any hoe in his hand; that after the shot was fired she immediately ran downstairs and out on the front porch and then saw Mr. Sechrest being as-

sisted by his wife to the front porch. Upon the question as to whether Mr. Sechrest had a hoe in his hand at the time of the shooting, this witness, Mrs. Bridgeford, answered questions as follows: "Q. If Mr. Sechrest had a hoe in his hands at the time of the shooting and dropped it as soon as he was shot, you couldn't have seen it? A. I don't believe I could state whether I could judge whether he had a hoe and had dropped it or not. Q. You don't undertake to tell this jury that Mr. Sechrest didn't have a hoe in his hand when he was shot? A. I only say I didn't see a hoe in his hand; that is all I can say."

J. W. Alexander substantially stated in his testimony that he was engaged in the grocery business and on the 23d day of June was employed by the Missouri Dairy Company as a driver of one of its wagons; that on the evening of that day he was driving south on 9th street and as he approached the watering trough at the northwest corner of Ninth and Prospect, his attention was attracted to the Sechrest premises by some loud talking on the west side of a clump of weeds that stood in the northwest corner of the Sechrest yard; that he arose in his wagon, stepped out upon the handlebar and looked in that direction; the wagon was moving at that time; that he could not understand what was being said by the parties who were talking, but they seemed to be quarreling; that when his attention was first attracted he could not see the parties but as his wagon advanced toward the south he saw three parties, two men and a woman, in the Sechrest yard between the pump and the rear fence, about twelve or fourteen feet to the rear of the house; that the taller of the two men was facing north and the other was facing south; that on account of the board fence on the east side of the Sechrest yard he could only see the head and shoulders of the defendant with whom he was personally acquainted; that he heard a shot and saw the smoke from the pistol; he says there was a gate in the fence on the east side of the

Sechrest yard, but that he didn't see the parties through the gate, which was opened at the time, but did see them over the fence. He further stated that at the time the shot was fired, so far as he could see, it seemed that Mr. Sechrest's arms were hanging at his side, and that he did not see him have any weapon raised above his shoulders; that after the shot was fired he saw Mrs. Sechrest assist her husband to the front porch, to which place the witness afterwards went.

The testimony on the part of the defendant tends to show that Dr. Zorn and a hired man named Orton went to the premises occupied by the deceased, Albert Sechrest, which were leased to the deceased by the appellant, but which were soon to be vacated; that the defendant Zorn and Orton went over to the premises occupied by the deceased for the purpose of planting some flowers. The defendant introduced witness Paul Begalke; this witness was in the employ of the defendant Zorn; he testified in part in substance about as follows: "On the 23d day of June, 1902, I was cleaning up in the house about 6:30 and I heard Doctor Zorn go into the kitchen, I don't know exactly I was upstairs or downstairs; I was cleaning up the house, I had my bucket full of paper, so I just went up and picked up the bucket and started out to the ash pile to burn it up, when I got out on the back porch I seen Dr. Zorn and this hired man walked out into the back yard; it was ten or fifteen feet in front of me, maybe farther than that; when I got out there I looked around and I seen this big fellow, Albert Schrest, he was on the back of the house; Doctor and his hired man was walking down to the gate; when I got out to the ash pile I saw again Mr. Sechrest; he was standing on the fence when Dr. Zorn and the hired fellow got to the fence; Joe Orton opened the gate and this big fellow, Mr. Sechrest, he said something, I don't know what he

did say, he said something; Joe Orton opened the gate; as soon as Joe Orton opened the gate Sechrest jumped through and snatched the hoe out of Joe's hand, then a couple or two and a half feet, he raised up the hoe to strike Doctor, then the shot was fired." This witness stated that he did not hear any loud talking and that the only thing he heard said was the remark by Sechrest which was made in such a low tone of voice that he could not hear it. He further testified that about four or six weeks before this killing happened the deceased told him, referring to Dr. Zorn, that he would like to get hold of this fat-bellied Dutchman.

Louis Dumball was another witness introduced on the part of the defendant. His testimony tended directly to contradict that of J. W. Alexander. He testified substantially that he was at the watering trough spoken of by witness Alexander and that he heard a shot fired and that he inquired of Alexander as to what was the matter over there where the shot was fired; that Alexander replied that "he didn't know;" he then described the Sechrest premises and about the location in the yard where the difficulty occurred, all of which tended to show that Alexander, from the point he says he was, was unable to see what he testified he did see in respect to this difficulty.

There were other witnesses introduced on the part of the defendant tending to show that where this difficulty occurred in the Sechrest premises was not at the place or point as testified to by Alexander. There was other testimony introduced on the part of the defendant tending to affect the credibility and weight to be attached to the testimony of Alexander and Mrs. Bridgeford.

Witness Pike was introduced on the part of the defendant; he was a civil engineer by occupation; he made a survey of the premises and surroundings where this difficulty occurred. His testimony tended to show that witness Alexander on the part of the State, at

the point where witness Alexander says he was standing on his wagon, could not have seen what he testified he did see in the Sechrest yard at the time of this difficulty.

There was also a controverted issue in this cause as to the proper foundation being laid for the introduction of the dying declarations of the deceased. It can serve no useful purpose to undertake to detail the testimony upon that issue. In laying the foundation the State introduced Horace S. Kimbrell and I. B. Kimbrell. The appellant upon this issue introduced Steven A. Northup, W. H. Coffey and Sepha Edmunds. We will give the testimony of the witnesses upon that issue such attention as it merits during the course of the opinion.

This is a sufficient statement to indicate the nature and character of the testimony upon which this cause was submitted to the jury, and is amply sufficient to enable us to determine the legal propositions involved. At the close of the evidence the court instructed the jury upon murder in the first and second degrees, self-defense and reasonable doubt and other phases of the case to which the testimony was applicable. It can serve no good purpose to embrace the instructions in this statement, but they will be given such consideration as we deem necessary during the course of the opinion. The cause was submitted to the jury and they returned a verdict finding the defendant guilty of murder of the second degree, and fixing his punishment at imprisonment in the penitentiary for a term of fifteen years. Timely motions for new trial and in arrest of judgment were filed and by the court overruled. Judgment and sentence was entered of record in conformity to the verdict and from this judgment the defendant in proper form and in due time prosecuted his appeal to this court and the record is now before us for consideration.

State v. Zorn.

OPINION.

The record in this cause discloses the assignment of numerous errors on the part of the trial court as a basis for the reversal of this judgment. We shall give to the complaints of appellant such attention as their importance merit and demand. The record before us discloses that counsel representing the defendant on this appeal did not represent him on the trial of the case in the lower court.

I.

It is insisted by appellant that the court erred in the exclusion of the testimony of witness Sepha Edmunds, the nurse at the hospital at the time it is said that the deceased made the dying declaration which was offered in evidence. The testimony of this witness, of which complaint is made, was as follows:

"Q. Do you remember when the Rev. Dr. Northrup came? A. Yes, sir. Q. Do you remember anything Mr. Sechrest said at that time with reference to getting well? A. He repeated the same things to Dr. Northup that he had to me that night and to others. Q. With reference to whether he wanted the doctor to pray for him?

"We object to that as immaterial.

"The Court. Anything that he said with reference to his condition you may show.

"Wouldn't it be competent to show that the declarant was an infidel?

"The Court. I have stated you can prove that if he said anything touching his condition. I don't want it unless it is in connection with some statement as to his hope of recovery.

"We offer that for the purpose of touching upon his infidelity.

"The Court. Objection sustained.

"Exception."

It is sufficient to say of this complaint that the action of the court in excluding this testimony does not, in our opinion, constitute reversible error. It is insisted by appellant that this testimony was admissible as tending to show that deceased was an infidel and therefore should go to the jury as affecting the weight to be attached to his dying declaration. We are unable to give our assent to this insistence. The testimony as above indicated has no such tendency and the fact that he either wanted or did not want the minister to pray for him was immaterial and the court committed no error in excluding it. If it was competent to show that the deceased during his life was an infidel for the purpose of lessening the weight to be attached to his testimony, to properly preserve the action of the trial court in refusing to hear testimony upon that subject, it was essential that the appellant should have the record disclose the testimony along that line he proposed to introduce, and having failed to do this there is nothing before this court upon that subject for review. As was ruled by BURGESS, J., in State v. Hodges, 144 Mo. l. c. 55, "The defendant should have stated what he proposed to prove so that the court could determine whether or not it was material and admissible in evidence." A similar rule was announced in case of State v. Martin, 124 Mo. 514.

## II.

It is next insisted that the court erred in excluding the testimony of Mrs. Oliver H. Stanley, respecting the general reputation of the deceased for being a turbulent and quarrelsome man. The law upon this subject is so well settled by the uniform expressions of this court that it is hardly necessary to cite authorities touching the subject. Where a homicide occurs under such circumstances that it is doubtful whether the act was committed maliciously or from a well-grounded apprehension of danger, testimony tending

to show that the deceased was of a turbulent, violent and desperate character is always admissible in order to determine whether defendant had reasonable cause to apprehend great personal injury to himself. [State v. Bryant, 55 Mo. 75; State v. Hicks, 27 Mo. 588; State v. Forsha, 190 Mo. l. c. 317; State v. Elkins, 63 Mo. 159.]

It is apparent from the record in this cause that the defense interposed and relied upon by defendant was that of self-defense. The testimony on the part of the defendant tended to show that the deceased at the time the fatal shot was fired was in a threatening attitude with a dangerous weapon in his hand and in the act of striking the defendant with such weapon. In addition to this there was also some testimony tending to show that the deceased had made some threats against the defendant. On the other hand, the evidence on the part of the State is in conflict with that introduced by the defendant and tends to show that the deceased and the defendant were entirely in a different attitude to that as detailed by one of the witnesses for the defendant. If the court, at the time this testimony as to the reputation borne by the deceased as to being of a rash, turbulent disposition, was offered, was sufficiently advised as to the defense relied upon by the defendant, then it was manifestly error to exclude this testimony. On the other hand, if the defendant had not sufficiently developed his defense to this charge as to advise the court of its nature and character, then there could be no prejudicial error in delaying the introduction of that testimony until the defense upon which the defendant relied was sufficiently developed to authorize its admission for the purpose of adding force to the defendant's plea of self-defense. It is only when a showing of self-defense is made that the character and reputation of the deceased for rashness, viciousness and turbulency becomes material. As was said in State v. Harris, 59 Mo. l. c. 553-54: "A man

may be a very bad man, rash, vindictive and turbulent, still he is under the protection of the law, and whilst he behaves himself peaceably, is entitled to the same protection as any other individual, and no person may slay him with impunity. It is only when he assumes a threatening attitude that his character may be considered as justifying conduct that would not constitute an offense in the case of another person of a different character.''

### III.

This brings us to the consideration of the most serious proposition disclosed by the record, that is, the complaint at the action of the trial court in submitting to the jury the question of the admissibility of the dying declaration of the deceased by instruction numbered 4 in the second series of instructions given by the court in this cause. The court in submitting this question to the jury said to them:

''And if you believe from the evidence that Albert Sechrest made such statements, that at the time of making the same his mind was clear and that he knew what he was doing and with such knowledge made it, and that at the time he made it he was suffering from a fatal wound inflicted by defendant upon him, and which wound afterwards caused his death, and that at the time of making such statement, he had given up all hopes of life, and then believed that death was impending and near, then it is your duty to consider it as the dying declaration of said Albert Sechrest.''

It is manifest under this instruction that the jury were required in the first instance to determine before considering the instrument of writing purporting to be the dying declaration of the deceased, as to whether or not in fact it was a dying declaration and admissible in evidence. This instruction was manifestly erroneous. While it was the province of the jury to determine the credit or weight to which such dying decla-

ration was entitled, the question as to whether or not it was a dying declaration made by the deceased and admissible in evidence was a question solely for the consideration of the court and not for the jury. In State v. Simon, 50 Mo. 370, it was expressly ruled that it was the duty of the court to decide upon the admissibility of the dying declaration, and that the truth of the facts put in evidence, to show the declarations were made in view of speedy death, is a matter exclusively for the court to determine. In State v. McCanon, 51 Mo. 160, a similar ruling was made in respect to a dying declaration, and it was held that the only province of the court was to determine the admissibility of such declaration and then leave the credit or weight which should be attached to it to the jury. To the same effect is the case of State v. Burns, 33 Mo. 483. In State v. Johnson, 118 Mo. 504, in discussing this proposition, the court said: "The propriety of the admission of dying declarations is a preliminary question for the determination of the court before they are allowed to go to the jury. [Wharton on Criminal Evidence (9 Ed.), sec. 297; State v. Simon, supra.] In the present case this course was not pursued, but the testimony was allowed to go directly to the jury without any preliminary determination by the court. But even if the evidence to establish such declarations is admitted in the usual way, still, if improperly permitted to go to the jury, this is an error which can be corrected on appeal. [State v. Simon, and Wharton on Criminal Evidence, supra.]"

It is fundamental that in order to authorize the admission of dying declarations in evidence it is essential that at the time they are made there must be a consciousness of impending death, and it is the exclusive province of the court to determine whether that condition exists before the declaration is admissible. [Wigmore on Evidence, sec. 1451.]

We have carefully analyzed the disclosures of the record upon this subject and we see no escape from the conclusion that so far as is disclosed by the record the trial court, after hearing all the testimony respecting the condition of mind of the deceased at the time the declaration was made, failed to determine, as it was its sole province to do, whether or not the instrument read in evidence was in fact to be considered as a dying declaration made by the deceased just prior to his death. In other words, the record before us fails to disclose that the trial court after hearing the testimony on the part of the State and on the part of the defendant touching the circumstances attending the making of the dying declaration and the condition of mind of the deceased existing at the time such declaration was made, ruled that the declaration as contained in the purported instrument of writing was in fact a dying declaration and should be considered by the jury, and the court nowhere in any of its declarations of law tells the jury that the instrument of writing offered in evidence was the dying declaration of the deceased, and submitting to them for their consideration the question as to the weight to be attached to such declaration, but the court did what, in our opinion, was error, plainly submitted to the jury, first, the question as to whether or not the declaration was made under such conditions as to authorize its consideration in evidence. In other words, the jury were called upon to determine the admissibility of the instrument of writing offered in evidence purporting to contain the dying declaration of the deceased.

The rules of law which have been repeatedly announced by this court applicable to the admission of dying declarations, may thus be briefly stated: It is the manifest duty of the trial court as a basis for the admission of dying declarations to hear such testimony as may be offered by the State and the defendant

respecting the existence of the essential conditions necessary to constitute them dying declarations. While this hearing may be either in the presence or absence of the jury, yet it is the sole province of the court after the hearing of such testimony to determine the admissibility of such declarations, and the jury have absolutely nothing to do with their admissibility.

It is insisted by the learned Attorney-General that no prejudicial error was committed by the court in submitting the question as to the admissibility of such dying declaration to the jury. We are unable to give our assent to this insistence. It may be conceded that had the court, after hearing all the testimony both for the State and the defendant upon the preliminary question as to the admissibility of the dying declaration, ruled that it was admissible and admitted it in evidence, the mere fact that the court erroneously again submitted such preliminary question by an instruction to the jury, would not have constituted such error as would authorize the reversal of the judgment, for in that instance the court would have properly exercised its province by passing upon the question, and the mere fact that it also required the jury to pass upon it could not be deemed as prejudicial error to the defendant. But that is not this case. The record discloses that the court first proceeded to determine this preliminary question in the absence of the jury. The State introduced its evidence and the defendant interposed an objection to the introduction of the so-called dying declaration, first, that the testimony as introduced by the State did not show the existence of such a condition of mind as would authorize it to be considered a dying declaration, and for the further reason that the court has at this time refused the request of the defendant to require all the witnesses capable of bringing light on the subject to be brought before him. The record does not disclose that the court in the absence of the jury at that time passed on the admissibility of

the dying declaration, and it is clear from the remarks of the learned trial judge that he did not intend to do so at that time, for he said to counsel: "The court at this time will permit the defendant to introduce any witnesses touching the execution and circumstances attending the taking of the dying declaration, or you can offer it before the jury if you wish." After this remark to counsel by the trial judge the jury were immediately called in; the State again proceeded to introduce its testimony, laying the foundation for the introduction of the dying declaration. The paper writing purporting to contain the dying declaration was identified and at the close of the State's evidence offered in evidence to the jury. Counsel for defendant renewed their objections to the introduction of the dying declaration, which objections were overruled. The court had just previously, in the absence of the jury, informed counsel that he would hear them then or would hear them in the presence of the jury. While it is not error for the court to refuse to compel the State to introduce all the witnesses present at the time the dying declaration was made, it was manifestly the duty of the court to hear the testimony offered, both for the State and the defendant, upon the preliminary question of laying the proper foundation for the introduction of the dying declaration before admitting it in evidence, and that is what the defendant was insisting upon from the very inception of the inquiry as to this preliminary question.

It is apparent from the record before us, and we see no escape from the conclusion, that the trial court did not undertake, and did not intend, to pass upon the admissibility of the dying declaration as made by the deceased embraced in the instrument offered in evidence. Certainly, if such was the purpose of the court it would have, as previously indicated, heard the witnesses for the defendant which were subsequently offered by the defendant upon this preliminary question.

The correctness of this conclusion is emphasized from the fact that immediately after the conclusion of the State's evidence, in which a prima-facie showing was made, and the offering of the instrument purporting to contain the dying declaration in evidence, the defendant then offered his testimony upon this preliminary question, and the State offered testimony in rebuttal of that offered by the defendant. Following this the court then by an instruction in plain and unambiguous terms, submits to the jury the question of the admissibility of such declaration, and that the court did not intend to pass upon the question as to whether or not the jury should consider this instrument as a dying declaration, and simply intended to submit that question to the jury, as evidence by the instruction, in our opinion is too plain for discussion.

Upon this appeal it is clearly the duty of this court to review the action of the trial court upon the subject of dying declarations, their admissibility, etc., and the very first question which confronts the court upon this appeal is as to the sufficiency of the basis of foundation laid upon the preliminary inquiry to authorize their admission in evidence. In reviewing the testimony which constitutes the basis for the admission of the dying declarations in this cause this court must consider the entire testimony. It certainly will not be seriously contended that the court might consider the prima-facie showing as made by the State and exclude that portion of the evidence offered by the defendant. This leads us to the inquiry, if this record is to be construed as disclosing that the court determined the admissibility of the dying declaration, as to how this court is to pass on and review the testimony offered by the defendant and the rebuttal testimony offered by the State, which, as disclosed by the record, was never passed on by the trial court in reaching its conclusion that the dying declaration was admissible. This court is not authorized in reviewing testimony before the trial court, which

the record plainly discloses was never taken into consideration in reaching the conclusion that the State should be permitted to offer the instrument purporting to be the dying declaration in evidence. In the first place, it was the duty of the trial court to determine the preliminary question as to whether there was sufficient basis for the admission of the dying declaration, and after a careful analysis of the entire disclosures of the record, we are unable to reach the conclusion that the court made any ruling upon that question. If on the other hand, the action of the court is to be construed as passing upon that question, then we confess, with the disclosures of the record confronting us, that we are unable to see how this court is to intelligently determine whether the action of the court in respect to the admission of the dying declaration was proper or not. We have here, as shown by the record, first, a preliminary inquiry in the absence of the jury; upon the suggestion of counsel for the defendant that all the witnesses had not been heard, the court informed counsel that he would either hear them then or any witnesses offered on the part of the defendant might be heard before the jury. The jury were immediately called in, the State reintroduced its testimony, with the execption of that of Mr. Gray, and the instrument purporting to contain the dying declaration was identified and offered in evidence over the objections of the defendant; the defendant then proceeded to introduce its testimony rebutting the facts as alleged by the State and the State finally concluded the inquiry by introducing other testimony in rebuttal of that offered by the defendant, whereupon at the conclusion of all the evidence the court expressly submitted the question to the jury as to whether or not the proper foundation had been laid for the introduction of the dying declaration. Thus we have presented a record that discloses that the court heard testimony as offered by the State

and upon the prima-facie showing permitted the instrument purporting to contain the dying declaration to be offered in evidence. The jury then heard the testimony as offered by the defendant and the rebuttal testimony offered by the State and while it may be said that the court heard the testimony as offered by the State and upon the showing as made permitted the instrument of writing signed by the deceased to be read in evidence, it is clear that the court in passing upon that question did not take into consideration the testimony as offered by the defendant or the testimony by the State offered in rebuttal, for the reason such testimony at that time had not been introduced, and finally the court by its instruction numbered 4 submits the entire question to the jury to be determined by them, from the testimony as offered by the State and the defendant and the testimony in rebuttal, as to whether or not at the time the deceased made the declaration there existed in his mind the essential conditions necessary to constitute it a dying declaration and admissible in evidence as such. This instruction was erroneous. It was the sole and exclusive province of the court to determine that question, and while it may be conceded for the purposes of this case that, if the court, upon the entire testimony both for the State and for the defendant, had expressly ruled that a sufficient foundation had been laid for the introduction of the dying declaration, this court would be inclined to defer to the judgment of the trial court in weighing such testimony, since it had the witnesses before it; however, until a record is presented that discloses that the trial court exercised its sole province of determining whether the essential conditions existed in the mind of the decedent at the time he made the declarations necessary to constitute it a dying declaration and admissible in evidence, there is no necessity for this court to express an opinion upon that question.

There should be no guess work or inferences in-

dulged in in respect to the question as to whether or
not the court made a ruling that the proper foundation
was laid for the introduction of dying declarations;
the record should clearly indicate that fact.   As was
said by TURLEY, J., in Smith v. State, 9 Humph. 9,
"Testimony of this character is only admitted from
necessity, and an abuse of it is guarded against by
the law with most minute particularity."   And as was
announced by this court in State v. Johnson, 118 Mo.
1. c. 502, quoting approvingly what was said by BYLES,
J., "Dying declarations ought to be admitted with
scrupulous, and, I had almost said, with superstitious
care.   They have not necessarily the sanction of an
oath; they are made in the absence of the prisoner;
the person making them is not subject to cross-exam-
ination, and is in no peril of prosecution for perjury."
Hence, we say that the record upon this subject should
not be left in doubt as to whether or not the defendant
had the benefit of the judgment of the trial court upon
the preliminary question as to the admissibility of the
dying declaration.

## IV.

It is next contended by appellant that the court
erroneously declared the law upon the facts developed
in this case in its instructions to the jury numbered
four and five, which are as follows:

"4.   The court instructs the jury that if they find
and believe from the evidence that the defendant, Louis
Zorn, on the 23d day of June, 1903, intentionally shot
Albert Sechrest with a pistol in a vital part of the body
and that said pistol was, as used, a deadly weapon, and
that said Albert Sechrest died from the effects of such
shots within one year thereafter, the law presumes that
the defendant intended the natural consequence of his
act, and from the use of a deadly weapon the existence
of malice may be inferred, and in the absence of proof
or circumstances showing deliberation the defendant

would be guilty of murder in the second degree, unless the jury believe from the evidence that the defendant killed the deceased in the necessary defense of his own person. Therefore, the court instructs the jury that if you find and believe from the evidence that the defendant, Louis Zorn, at the county of Jackson and State of Missouri, at any time before the 19th day of December, 1903, feloniously, willfully, premeditatedly and with malice aforethought, with a certain revolving pistol and the same was a dangerous and deadly weapon, shot and killed Albert Sechrest, you will find defendant guilty of murder in the second degree, and assess his punishment at imprisonment in the penitentiary for any time not less than ten years.

"5. The court instructs the jury that if you find and believe from the evidence that the defendant provoked or began the quarrel or a difficulty with the defendant with the purpose of taking advantage of him and of taking his life or of doing him some great bodily harm, then there is no self-defense in the case however imminent the peril of the defendant may have become in consequence of an attack made upon him by the deceased."

It is sufficient to say of instruction numbered 4, that, while in some particulars it varies from the precedents so often approved by this court, the first part of it fully recognized the principle of law that the intentional killing of a human being by the use of a deadly weapon upon a vital part of the body is presumed to be murder in the second degree, in the absence of proof to the contrary. [State v. Evans, 124 Mo. 397; State v. Fairlamb, 121 Mo. 137; State v. Young, 119 Mo. 495; State v. Foster, 61 Mo. 549; State v. Hudson, 59 Mo. 135.]

It is insisted by appellant that this instruction is erroneous for the reason that it ignores the provocation which might reduce the killing from murder in the second to manslaughter in the fourth degree. It will

suffice to say as to that question that appellant is in no position to urge it, for two reasons: First, because he strenuously objected to the court giving an instruction on manslaughter in the fourth degree and therefore cannot be heard to complain because such theory was not embraced in the instruction. Secondly, under the facts as developed at the trial of this cause the offense was either murder in the first or second degree, or it was no offense at all on the ground that the defendant was justified in the act of killing in the necessary self-defense of his person.

We are unable to determine now what the evidence may develop upon the retrial of this cause, but it is sufficient to say that the law of murder in the first and second degrees as well as manslaughter in the fourth degree is well settled in this State, and should the evidence upon a retrial warrant the court in embracing and covering all those grades of the offense the presumption is that it will be done, and that the court will so modify instruction numbered 4 as to conform to the repeated rulings of this court.

Complaint is also made that the court ignored the theory which is now advanced by appellant of imperfect self-defense. We have carefully analyzed all the facts disclosed by the record and so far as is shown by the developments at the trial, the record of which is now before us, there was no imperfect self-defense in this case. He was either perfectly justified or he was not justified at all. The defendant in this cause interposed the plea of self-defense, and from the very inception of the trial insisted that the deceased was the aggressor and wrongdoer and the right of imperfect self-defense can only arise when the defendant at the commencement of the difficulty is the aggressor or wrongdoer. The law of imperfect self-defense is very clearly stated in Reed v. State, 11 Tex. App. 509, which has been substantially adopted by this court. The law was thus stated: "A perfect right of self-defense can

only obtain and avail where the party pleading it acted from necessity, and was wholly free from wrong or blame in occasioning or producing the necessity which required his action. If, however, he was in the wrong —if he was himself violating or in the act of violating the law—and on account of his own wrong was placed in a situation wherein it became necessary for him to defend himself against an attack made upon himself which was superinduced or created by his own wrong, then the law justly limits his right of self-defense, and regulates it according to the magnitude of his own wrong. Such a state of case may be said to illustrate and determine what in law would be denominated the imperfect right of self-defense.''

The complaint urged against instruction numbered 5 is that there was no evidence upon which to predicate it. All that is necessary to say concerning this instruction is that it is substantially in proper form and if upon the retrial of this cause there is any substantial testimony tending to show that the defendant sought or provoked the difficulty, with the felonious intent of wreaking his vengeance by killing the deceased or doing him some great personal injury, then the instruction is a very appropriate one and should be given, otherwise unless there is some substantial testimony tending to show that the defendant sought or provoked the difficulty with such intent, then it should not be given.

## V.

Appellant complains of errors committed by the court in the exclusion of testimony offered upon the preliminary inquiry in laying the proper basis or foundation for the admission of the dying declarations of the deceased. It is insisted that the court erred in excluding evidence which tended to prove that the deceased objected to sending for a minister or his relatives. It is only necessary to say of this complaint that

this testimony is mainly addressed to the court, and while the court should admit all testimony tending to show the condition of the deceased at the time the declarations were made, yet we are of the opinion that the exclusion of this testimony was not reversible error; furthermore, it appears that the substance of this testimony was introduced without objections through another witness.

## VI.

Appellant insists that the court committed error in refusing to give instructions numbered 8 and 11 asked by the defendant. These instructions sought to present to the jury the law regulating the relations of landlord and tenant and announcing the principle of law that a mere trespass would not justify a felonious assault upon the trespasser, and if a felonious assault was made upon such trespasser he would have the right to prevent the same even to the extent of killing his adversary.

The record discloses that the court gave the defendant the full benefit of an instruction fully setting forth the law of self-defense, and in no way limited the defendant's right of self-defense by reason of the fact that the homicide occurred upon the premises occupied by the deceased. The instruction on self-defense given by the court clearly accorded to the defendant all the rights he would have possessed on premises not in the possession of the deceased. With this view we are unable to see how the defendant was prejudiced by the refusal of the instructions requested; however, we will say that notwithstanding this instruction, the representative of the State in his argument to the jury does in certain parts of it undertake to discuss the rights of landlord and tenant. In view of the instructions given by the court this argument should not have been permitted. It is sufficient to say upon this proposition that the law upon the rights of landlord and tenant is

well settled in this State, and if upon the retrial of ·
this cause there is any substantial evidence which ren-
ders it necessary to define those rights to the jury, the
court should by a proper instruction define such rights.
If the facts do not warrant any such declaration of
law then the court should not permit counsel on either
side to indulge in an argument as to what the law
is upon that subject.

## VII.

Finally, it is earnestly insisted that an analysis of
the entire record discloses that the defendant did not
have a fair and impartial trial, and numerous com-
plaints are directed to the remarks of the prosecuting
attorney in his argument to the jury. We will not
undertake to discuss the error complained of respecting
such argument, for the reason that many of the com-
plaints now insisted upon were not properly preserved
in the bill of exceptions by timely objections and excep-
tions to the remarks made. The law is well settled in
this State upon this subject, and as demonstrated by
repeated rulings, this court will not hesitate to reverse
a judgment where the representative of the State has
indulged in a line of argument which makes it apparent
that a fair and impartial trial has been endangered.
We have read very carefully the argument as pre-
served in the record of the prosecuting attorney, and
with all due respect to his ability, energy and zeal,
we must say that many things were said in the discus-
sion of this case which would have been better left
unsaid. Our observation as to trials of criminal causes
is that the State as well as the defendant is best rep-
resented by counsel who confine themselves to a dis-
cussion of the facts and questions clearly within the
record. While we will not undertake to pass upon the
remarks of the prosecuting attorney, for the reason be-
fore stated that the points are not properly preserved
by the bill of exceptions, it is not perhaps inappro-

priate to say that the record before us discloses that many of the objectionable features of the argument made by the representative of the State were provoked by statements and arguments made by the counsel for the defendant and they therefore are in no position to complain on that score.

The information upon which this prosecution is based is sufficient. While it may not strictly and technically conform to the rules of grammar and rhetoric, in our opinion it fully and sufficiently informs the defendant of the nature and cause of the accusation. [State v. Turlington, 102 Mo. l. c. 651; State v. Wilson, 172 Mo. l. c. 428; State v. Gregory, 178 Mo. l. c. 56; State v. Gray, 172 Mo. 435; State v. Long, 201 Mo. 664.]

The record in this cause is quite voluminous and embraces many other complaints of error committed by the trial court to which we have made no special reference; however, we will say that we have considered them and find that they are not of that character as would constitute reversible error, therefore, we deemed it only necessary to indicate our views upon the vital propositions disclosed by the record. We have given expression to such views and indicated our conclusions, and for the error pointed out the judgment of the trial court should be reversed and the cause remanded, and it is so ordered.

All concur.