### THE STATE v. HERMAN A. KRETSCHMAR, Appellant.

**Division Two, December 27, 1910.**

1. **EVIDENCE: Remote Threat: Homicide.** When the threat is conditional on the doing of an act which deceased has performed shortly previous to the homicide, the intervening time is of little importance. Where defendant who had not paid deceased for his stock in a corporation, threatened that, if deceased forced him out of the company by compelling him either to pay or surrender his stock, he would kill him, and afterwards deceased did that, and he shortly thereafter killed him, the evidence of the threats was competent, though they were made eighteen months prior to the time defendant was discharged.

2. **IMPERFECT SELF-DEFENSE: Instruction: No Evidence.** The doctrine of imperfect self-defense is recognized law in this State. It arises only when the defendant at the commencement of the difficulty is the aggressor or wrongdoer, and where his act and intent in bringing on the difficulty is unlawful but not felonious. But where the testimony entirely fails to prove that defendant was the aggressor or a violator of the law and as such sought the difficulty, but on the contrary, if true, he acted in perfect self-defense and the homicide was justifiable, or else it was premeditated and deliberate murder, no instruction on the subject of imperfect self-defense should be given.

3. **INSTRUCTION: Timely Objection.** An exception to an instruction should be made at the time it is given; an objection made for the first time in the motion for a new trial is not timely.

4. **HOMICIDE: Voluntarily Seeking Difficulty: Instruction.** The evidence in this case is reviewed and held as tending to show that the defendant, with the felonious intent of taking the life of deceased or doing him some great bodily harm, voluntarily

State v. Kretschmar.

sought or invited the difficulty and voluntarily engaged therein,. and authorized an instruction as to the felonious intent at the time he shot and killed deceased.

5. ———: Evidence: Reasons for Carrying Concealed Weapons: Excluded: Harmless Error. It is competent for a defendant. on trial for murder to explain why he was carrying the deadly weapon by means of which the crime is alleged to have been committed. But where the defendant had at great length explained his reasons for carrying the pistol and was permitted in his own way without objection to answer the question, "Why did you carry it?" it is harmless error to refuse to permit him to answer the question a second time, when his counsel stated the proposed explanation did not refer to any relations with deceased.

6. ———: ———: Collateral Matters: Discharge from Employment. The question of whether or not the mill company of which deceased was the chief owner and officer, had good and sufficient reasons for discharging appellant from its service, was collateral to the homicide issue on trial, and should not have been injected into the case. But where the only reason given was that defendant had not as salesman secured as much business for the company as it was thought he should have done, and defendant had, prior to such explanation, brought out the fact that he had been discharged, the reason given was so mild and colorless that it cannot be said to have tended to prejudice any substantial right of defendant.

Appeal from St. Louis City Circuit Court.—*Hon. George H. Shields,* Judge.

AFFIRMED.

*Chas. P. Johnson* and *C. Orrick Bishop* for appellant; *Thos. B. Harvey* of counsel.

(1) The threat, if threat it may be called, was made a year and a half before the tragedy, at a time when the three parties, appellant, deceased and the witness, were upon the most amicable terms, which terms apparently continued up to the fatal day; there was no expression of animosity or hostility towards deceased any more than to the witness Gloor; the remark itself was not taken "seriously" by the witness. (2) The feeling of hurt

or soreness which affected appellant, according to the State's own evidence, did not grow out of appellant's ceasing his connection with the mill, but out of an entirely distinct transaction, to-wit, the writing by deceased of letters to a friend and former business client of appellant which reflected upon appellant's business capacity and integrity; and it was of this action of deceased that appellant was complaining to witness at the time of the conversation on their walk on Broadway. The State's officer contended with vehemence that the appellant "had done just what he said he would do," when his own evidence did not sustain his position. (3) The testimony was highly prejudicial to appellant, as not only suggesting a motive for the homicide which had no foundation in fact, but also as giving rise to a presumption in the minds of the jury that because appellant may have, a long period before, uttered intemperate remarks, he must necessarily have slain in malice and with premeditation. While it has been often held by this court that the value of threats as evidence is not affected by their remoteness from the time of the tragedy nor by the fact that they were conditional in their expression, yet there must of necessity be some connection between their utterance and the deed under inquiry. (4) The court grievously erred in instruction 7, given for the State, upon the subject of one's seeking or inviting a combat or putting oneself in the way of being assaulted in order that when hard pressed one may have a pretext to take the life of one's assailant, etc. There was no evidence in the case upon which to base such an instruction. There was no eye-witness to the homicide (so far as the record shows) and the only testimony as to the *res gestae* of the homicide is that of the appellant. State v. Edwards, 203 Mo. 528; State v. Herrell, 97 Mo. 111; State v. Walker, 196 Mo. 85; State v. Gordon, 191 Mo. 122.

*Elliott W. Major,* Attorney-General, and *John M. Atkinson,* Assistant Attorney-General, for the State.

(1) The threat was made by appellant at the time and in connection with the fact that deceased wanted a controlling ownership of the stock of the Mill Company, if he were to furnish the needed amount of money to keep the Mill Company on its feet. While appellant had not then, nor did he thereafter, ever pay one cent on the stock he bought from deceased or Gloor, yet he did not want deceased to have a controlling interest of the stock for fear that he (appellant) would lose his job with the company. Less than one hour before deceased was killed, appellant complained to Gloor about deceased having bought the controlling interest of the stock for his son. Appellant used the Delph letters only as a pretense or excuse to wreak his deep-seated malice and hatred for deceased because he had been "put out" of his position by deceased, as he termed it. The remoteness of threats from the date of the commission of the crime does not affect their admissibility or competency, but only affects their weight, which is a question for the jury to determine in passing on the whole case. State v. Porter, 213 Mo. 62; State v. Coleman, 186 Mo. 158; State v. Grant, 79 Mo. 137; State v. McNamara, 212 Mo. 163; State v. Feeley, 194 Mo. 313; State v. Cochran, 147 Mo. 517; State v. McNally, 87 Mo. 644; Culbertson v. Hill, 87 Mo. 555; 1 Wigmore on Ev., sec. 107; 4 Elliott on Ev., sec. 3035. (2) The complaint is that there was no evidence in the case upon which to base instruction 7. We contend that there is an abundance of evidence in proof in this case to warrant the giving of this instruction, and that the court did not err thereby. A similar assignment of error was recently reviewed by this court in the case of State v. Dunn, 221 Mo. 545. The physical facts and the testimony disclosed are many times stronger and more conclusive than those disclosed in proof in the Dunn case, supra.

KENNISH, J.—On the 18th day of February, 1909, the grand jury for the city of St. Louis returned an indictment charging Herman A. Kretschmar, the appellant herein, with murder in the first degree for the killing, with a pistol, of Clarence N. Jones, on the 3d day of February, 1909. Appellant was thereafter tried, found guilty of murder in the second degree, and his punishment assessed at imprisonment in the penitentiary for a term of eighteen years. Timely motions for a new trial and in arrest having been duly filed and by the court overruled, appellant brings the cause to this court by appeal, and assigns error.

The material facts of this cause, as disclosed by the evidence for the State, are about as follows:.

The Commonwealth Feed Mills Company is a corporation with its office and place of business located at the corner of North Second street and DeSoto avenue in the city of St. Louis. For about one and a half years prior to the 12th day of January, 1909, appellant had been the nominal secretary of the Mill Company, yet his real and active duties took him out most of the time as a traveling salesman for the feed products of the mill. On the last-named date appellant surrendered all of his stock and resigned as secretary of said Mill Company, as requested by its board of directors. He continued his services as salesman until the first day of February, 1909, after which time he had no further connection with the company.

On the 3d day of February, 1909, the day of the fatal tragedy, the deceased, Clarence N. Jones, was the president of the Mill Company and was the owner of fifty-one shares of its stock, which was a controlling interest. Edwin Gloor was its vice-president and treasurer, and Drummond Jones, a son of deceased, was its secretary.

In the latter part of the month of October, or the early part of November, 1907, the Mill Company was in

great financial distress. Mr. Jones was then living at his summer home at Arcadia, in this State, and owned twenty-five shares of the stock of said Mill Company; Gloor owned forty shares, and appellant thirty-five shares. It appears that appellant had bought what stock he then owned from the deceased, and Gloor, severally, and that he had given to each of said parties his note for the purchase price of the stock so purchased.

Gloor and appellant made a trip or two to Arcadia to see deceased about putting more money in the business. This Mr. Jones declined to do unless he owned a controlling interest in the stock of the company. After some delay Mr. Jones was sold enough stock by Gloor and appellant to give him fifty-one shares, as he had requested, and he then furnished the money needed by the company. Appellant and Gloor each continued to own a portion of the stock.

It appears in the record that appellant had failed to pay deceased or Gloor for a single share of the stock which they had sold him and some time during November or December, 1908, appellant was notified by deceased that he must pay for the shares he then owned and had purchased from deceased or return them and take up his note, which he had given in payment therefor.

At the time appellant ceased to be a stockholder and tendered his resignation as secretary (January 12, 1909), the Mill Company owed deceased more money than the entire value of the capital stock of the corporation.

Appellant's employment with the company as secretary and salesman began in the month of August, 1907, and soon thereafter he made a contract for the company with Edmund E. Delph of Philadelphia, Pennsylvania, by the terms of which Delph was to act as distributing agent for the product of the mill in that State and the surrounding district. At first many or-

ders were received by the company from Mr. Delph, but the business began falling off, and on March 11, 1908, and again on the 17th day of the same month, the deceased wrote to Mr. Delph and in each letter complained that orders were not coming in from his agency as formerly, and asked for an explanation. The deceased referred in the letters to the representations made to him by appellant and Gloor as to the amount of business which could be expected from that agency and of his consequent disappointment over the results. Appellant learned of these letters, and obtaining the originals from Mr. Delph in October, 1908, made two copies of each. He seems to have considered the references to him in the letters as a reflection upon his character as a business man. The deceased had also written a letter to a man named Dula in New York City, which was not offered in evidence, but of which appellant had heard and took exceptions to as also reflecting upon him.

When it became necessary to secure additional funds to continue the business of the company in the fall of 1907, appellant was greatly incensed at the refusal of the deceased to supply the money unless upon the condition of becoming the owner of a controlling interest in the stock, and appellant complained to Gloor at the time that deceased wanted to hog the proposition so that if it became profitable he could take it all himself, and he then said to Gloor, ''I would kill anyone that went back on me that way; I would kill him; I would kill you if you went back on me.''

Appellant had said nothing about the Delph letters to the deceased or Gloor until Monday, February 1, 1909, the day after his connection with the company had ceased. That day, meeting Gloor on the street, he said: ''I have got something to show you in a few days.''

On Wednesday, the 3d day of February, 1909, appellant went to the office of the Mill Company between

noon and one o'clock, having no special business, as he testified, but he still had a desk and some personal effects there. He had with him copies of the Delph letters and was armed with a revolver. On his way to the mill he stopped at a saloon and took a drink of whiskey. Arriving at the mill he found the deceased and Gloor at work in the office, the deceased sitting at his desk in his shirt sleeves engaged in addressing letters. No conversation of any special importance took place. About one o'clock appellant asked Gloor if he was going down town, and Gloor informed him he was as soon as he finished copying a letter. Appellant and Gloor then left the office and walked to Broadway, and then to Gano avenue, where Gloor took his car. While appellant and Gloor were taking this short walk of about six blocks, the following conversation, in part, as testified to by Gloor, concerning deceased, took place between them: "I said, 'I don't think it was very kind of you to try to buy out Mr. Jones's interest and leave me out entirely.' He says, 'Your stock isn't worth anything. You will have to make sixteen thousand dollars before you can pay a dividend.' He says, 'Mr. Jones has bought this mill for his son.' He says, 'He is on record to that effect.' He says, 'He has put me out and he will put you out.' "

While Gloor was waiting at Gano avenue for his car, he was reminded of the promise appellant made to him on the Monday before to show him the Delph letters, which appellant then drew from his pocket and handed to Gloor. After the latter had read the letters he endeavored to convince appellant that Jones was simply trying to get business for the company and was not intending any reflection by what was said in the letters. Appellant was angry and said: "It is a reflection upon my intelligence and on my integrity and business ability; it is on yours, too." When this conversation ended Gloor's car came, and he asked appellant if he was going down town, to which he received a

negative reply.  After leaving Gloor, appellant re-
turned to the office of the Mill Company, reaching there
about 1:30 o'clock, where he found deceased still at his
desk at work.  The deceased had been in the habit of
remaining in the office during the noon hour and not
going out for his lunch.  This fact was known to ap-
pellant.  The mill was not running that day and very
few persons were around the premises.

The witness Pascal, who was the miller, was in
the machinery room of the mill and  saw  appellant
come from the office, go to the hydrant and take a drink
of water, and then return to the office.  An ink peddler
had come into the office to sell ink to the deceased, and
came out about the time appellant was seen by Pascal
to re-enter.  In less than two minutes after the ink
peddler had left the office and before he had gone one
hundred feet, appellant came to the office door and
called to Pascal, saying: "Pascal, come in here; I have
shot that fellow."  Pascal replied, "What do you
mean, fellow?  You must be crazy," to which appellant
replied, "But the lie passed between us; he made an
effort to get to his hip pocket."  When appellant came
out of the office he had a .38-calibre Smith & Wesson
pistol in his hand and was putting it in a rubber hol-
ster, and then put it in his hip pocket.  As appellant
was leaving he said to Pascal: "Better search that
man, see if he isn't armed."  Pascal immediately en-
tered the office and found the body of deceased sitting
in a chair, his right arm slightly under his body, and
the left arm over the body; his face against the parti-
tion wall; his glasses still on; the chair partly tilted or
turned, and a caster from the chair loose on the floor.
All papers were found on his desk undisturbed; copies
of the two Delph letters were lying on his desk, and
there was no evidence of a struggle.  Deceased had re-
ceived three pistol wounds and was dead when Pascal
reached the body; one bullet entered above the back of
the left ear, penetrated the brain and ranged down-

ward; the second bullet entered about one inch below the fold of the left arm, between the third and fourth ribs, ranged downward and lodged near the tenth rib on the right side; the third bullet entered the right arm. No powder burns were found on the body. Deceased was searched and no weapon was found on his body or in his desk. A small pocket knife, closed, was found in his trousers pocket.

The deceased was about sixty-one years old and appellant near sixty at the time of the tragedy. They were about the same size and weight; they had known each other for many years and had been friends. For the last six months prior to the killing, while they had always spoken, yet they had not been on such friendly terms as in former years.

Appellant testified in his own behalf and admitted the killing of the deceased with a .38-calibre Smith & Wesson pistol, which was offered in evidence. He admitted having had a conversation as testified to by witness Gloor, but denied that he had ever threatened to kill deceased. He testified that when he left Gloor at Gano avenue he went back to the office to see deceased about the Delph letters and found him still at work at his desk addressing envelopes; that he began a conversation with the deceased about sending for appellant's desk and other effects and then handed him the copies of the Delph letters, which deceased read; that after calling deceased's attention to certain statements in the letters, which he said were not correct and asking him why he wrote those letters, the deceased answered, saying: "Oh, those letters are all right." Appellant insisted that the statements in the letters were unwarranted and asked deceased to write to Delph putting appellant right in the matter. Appellant then referred to another letter written to Dula in New York, and called upon deceased to explain as to it also. This character of conversation went on between the two until an ink peddler came in, whereupon appellant went

out to the hydrant for a drink, as heretofore stated. Appellant returned and was about through with the interview and said to deceased: ''Think over that. I am going to write to Mr. Dula this evening and ask him for your letter.'' What occurred thereafter between the deceased and appellant leading up to the homicide is related by appellant in his testimony as follows: ''Oh, I had the door partly open when I said that, 'Think it over.' I says, 'I am going to write to Mr. Dula this afternoon or evening asking him for your letter.' That door was open and Mr. Jones said, 'There is no good of your lying about Dula's letter.' Well, I was a little incensed; I don't know whether I closed the door or not. I went to the desk and tapped my finger (indicating) several times. I says: 'Now here, me lying about Dula's, here is A. Dula's letter. What do you mean?' I says: 'Dula (here indicates) some reference to me, and every time,' I said, 'that I am a liar you are fifty-seven varieties of a liar. You have lied to me about Ed, and I believe you lied to me when you told me your brother was a thief, and,' I said, 'I will go to George Jones,' or I may have said, 'George.' Well, he got up. I wouldn't use the words 'sprang up.' He got up very quick, he had his hand on the paper, or desk, and he says, 'You damned —— —— —— ——,' and he struck me. I dodged the blow, but he got hold of my arm—the coat sleeve—and I thought he was going to kill me. He reached for his pocket (indicating right hip pocket), and I thought he was going to pull his derringer, and I was feeling for my pistol, but he got hold of my sleeve and I got hold of it presently and reached around from in under and I fired three times just as fast as I could, and I don't know whether to say he fell or—I don't know what word to use. He fell into the chair. He really—I don't know what word to use—but on to the chair and went over against the wall on the floor. I went out in the mill and called for Pascal.''

Evidence was introduced tending to prove the good character of the defendant.

The cause was submitted to the jury upon instructions on murder in the first and second degrees, manslaughter in the fourth degree, self-defense, and such other instructions as were applicable to the facts in evidence.

I. Appellant complains that the court erred in admitting in evidence the testimony of witness Gloor concerning threats made by appellant against deceased about a year and four months prior to the homicide.

It is shown by the evidence that at the time the threats were made, as testified to by witness Gloor, all of the stock of the company was then owned by appellant, Gloor and deceased. The business had not been profitable and additional capital was needed. The deceased was the only one of the three stockholders able to furnish it, and he was unwilling to do so unless he secured a controlling interest in the company. That necessitated the sale and transfer of a part of the stock owned by each of the other stockholders to the deceased. The transfer was accordingly made and that was what caused appellant to say to Gloor that deceased "wanted to hog the proposition so that if it became profitable he could take it all himself," and that "I would kill anybody that went back on me; I would kill him; I would kill you if you went back on me."

In considering the question of the competency of this evidence it is important to keep in mind the fact that appellant had not paid for his stock, and that shortly before the homicide the deceased notified appellant that he must pay for the stock purchased from deceased or surrender it. He did the latter, and thus the very contingency had arisen which he had made the basis of the execution of his threat to kill. In appellant's own language, as he viewed it on the day of the homicide, the deceased "has put me out and he will put

you out.'' These facts bring the evidence objected to within the rule that ''when the threat is conditional on the doing of an act which the deceased has performed shortly previous to the homicide, the intervening time is of little importance.'' [6 Ency. Ev. 712.]

As shown by the following authorities the remoteness of the threats ''does not affect the question of the competency; it only goes to the weight of the evidence;'' and the circumstances and conditions under which the threats were made, as testified to by witness Gloor, are so intimately related to the facts and circumstances connected with and leading up to the homicide that we entertain no doubt as to the competency of the testimony. [State v. Porter, 213 Mo. l. c. 62-3; State v. Coleman, 186 Mo. l. c. 158; State v. Adams, 76 Mo. l. c. 357; State v. Grant, 76 Mo. l. c. 236; State v. McNally, 87 Mo. l. c. 650.]

II. It is next contended that the court erred in giving on behalf of the State instruction numbered 7. This instruction is said to be erroneous, first, for the reason that there was no evidence ''upon the subject of one's seeking or inviting a combat or putting himself in the way of being assaulted in order that when hard pressed he may have a pretext to take the life of his assailant,'' and, second, for the reason that it failed to tell the jury to what extent the right of self-defense would be forfeited in the event the defendant sought or invited the difficulty, or if he voluntarily entered into the difficulty without an intention of either killing or doing some great bodily harm to the deceased.

The second ground of attack on the instruction which we shall dispose of first, is that it did not submit to the jury the defendant's right of imperfect self-defense. The doctrine of imperfect self-defense is now the recognized law in this State. It arises only when the defendant at the commencement of the difficulty is the aggressor or wrongdoer, and where his act and

intent in bringing on the difficulty are unlawful but not felonious. Under such circumstances if the defendant, being in the difficulty, finds it necessary to take the life of his adversary to save his own, he has the imperfect right of self-defense to do so, and the homicide will be manslaughter and not murder. [State v. Gordon, 191 Mo. 114; State v. Zorn, 202 Mo. 12; Reed v. State, 11 Tex. App. 509.] It has been stated to be a "fundamental doctrine of universal recognition" that self-defense is a positive, affirmative, intentional act. [State v. Smith, 114 Mo. 406.] To be raised as an issue in a case it must be based upon evidence and in the case in hand it was based solely upon the testimony of the defendant. Imperfect self-defense is equally a positive, affirmative, intentional act and can only become an issue to be submitted to the jury upon an instruction, when the evidence tends to prove the facts upon which that right arises. The testimony of the defendant in this case, if believed, gave him the right to take the life of the deceased in perfect self-defense and the homicide was justifiable. But his testimony entirely fails to prove, nor is there any evidence in the case tending to prove that the defendant was the aggressor, the wrongdoer, or a violator of the law and as such voluntarily sought, invited or engaged in the difficulty with an unlawful intent less than felonious, and therefore there was no basis in the evidence for an instruction on the law of imperfect self-defense. In the case of State v. Zorn, supra, this court, in discussing the question under consideration, used language which is particularly applicable to the evidence in this case. The court (page 41) said: "We have carefully analyzed all the facts disclosed by the record and so far as is shown by the developments at the trial, the record of which is now before us, there was no imperfect self-defense in this case. He was either perfectly justified or he was not justified at all. The defendant in this cause interposed the plea of self-defense, and

from the very inception of the trial insisted that the deceased was the aggressor and wrongdoer, and the right of imperfect self-defense can only arise when the defendant at the commencement of the difficulty is the aggressor or wrongdoer." For the foregoing reasons we hold the instruction was not erroneous in failing to submit to the jury the law of imperfect self-defense.

It should also be noted that the instruction is not now open to attack upon the ground just considered for the additional reason that no such objection was made to it at the trial when the instruction was given, but was made for the first time in the motion for a new trial, and therefore too late for review in this court. [State v. Reed, 89 Mo. 168; State v. Finley, 193 Mo. 202.]

The point most strongly insisted upon against instruction number 7 is that there is no evidence in the record upon which to submit the issue to the jury that the defendant, with the felonious intent of taking the life of the deceased or doing him some great bodily harm, voluntarily sought or invited the difficulty or voluntarily and of his own free will became engaged therein.

A full statement of the facts in evidence accompanies this opinion, and it is not necessary that they should be repeated here. We shall give the following brief summary of the facts upon which, it is contended by the Attorney-General, the question of law contained in that part of the instruction under consideration not only arose in the case, but that an instruction thereon was required by the statute:

When it became necessary for appellant and Gloor to transfer a controlling interest of the stock in the company to deceased in order to secure additional funds needed in the business, appellant was angry and said to Gloor that deceased "wanted to hog the proposition so that if it became profitable he could take it all himself," and he then said to Gloor, "I would kill any-

body that went back on me; I would kill him; I would kill you if you went back on me." Appellant ascertained that deceased had written two business letters to Delph, the agent of the company in Philadelphia, in which reference was made to appellant and Gloor, and also that another letter had been written by deceased to Mr. Dula of New York, of similar import. He secured the Delph letters in October, 1908, and made two copies of each. He made no mention of these letters to either of his business associates until two days before the homicide, being the day after his connection with the company had ceased. The relations between appellant and deceased had not been so cordial as formerly for a few months before the homicide. Shortly before the homicide the deceased notified appellant that he must either pay his note or surrender the stock. He surrendered the stock and his relations with the company ended on February 1, 1909. On the 3d day of February, the day of the homicide, about midday, appellant, having no special business, went to the office of the Mill Company, stopping for a drink of whiskey on the way, and carrying in his pocket the copies of the Delph letters and a .38-calibre Smith & Wesson revolver. Arriving at the office he found the deceased and Gloor at work, but did not, in the presence of both, refer to the Delph letters. He asked Gloor if he was going up town, and he answered that he was. They left the office together, and upon reaching the car line he declined to go on with Gloor, but returned to the office, where he knew deceased would be alone at that hour. While walking up the street with Gloor he was angry and said he had been put out of the company by the deceased. He showed Gloor the copies of the Delph letters and sought to convince him that the letters reflected on both of them. Soon after the appellant went into the office upon his return after leaving Gloor, a peddler went in and appellant stepped out for a drink of water, but returned about the time the peddler left,

and almost immediately shot and killed deceased, whose body was found in a sitting posture in the chair almost as he had been sitting at work at his desk, and with three bullet wounds in his body. This was in part the evidence for the State. Did it tend to prove that appellant at the time of the killing went to the office with the intent to take the life of the deceased or to do him some great bodily harm?

In reviewing calmly these facts there are some observations which we think may fairly be made in passing upon the motives and purpose of appellant, as evidenced by his conduct and actions preceding and leading up to the homicide. Appellant had said in anger that he would kill anybody who would go back on him; he would kill the deceased. In the connection used, the words "going back" on appellant evidently meant taking from him his stock and interest in the company. He had paid nothing on this stock; had surrendered it but a few days before the homicide, and the very condition thus existed upon which appellant's threat against the life of the deceased was to be executed.

Appellant had in his possession for six months the letters written by the deceased and which he regarded as reflecting upon him, and yet he made no mention of them to his associates until two days after his salary had ceased and after he had surrendered his stock. He then places these two letters in one pocket and a deadly weapon in the other, and stopping for a stimulant on the way, goes to the office of the Mill Company. If his mission had been peaceful why did he not discuss the letters in a friendly way in the presence of his two former business associates, instead of taking the matter up with each separately, as he testifies he did? Indeed, if the letters did in fact reflect on appellant, or if he so believed, why did he not have the matter attended to during the six months preceding while he was with the company, and when it would have been to

the interest of the company as well as himself to have made the correction?

He gives Gloor to understand that he desired to go down town, and escorts Gloor to the car, then leaves him and returns to the office where he knew he would find the deceased alone. The two fatal bullets entered the head and body of the deceased and coursed downward, and the body, without any powder burns and the eye-glasses still in place, was found sitting in the chair as deceased had been at work, except that the chair was tilted against the wall.

In our opinion the evidence thus reviewed indicates that appellant in arming himself and killing Jones was carrying out a purpose which had been carefully designed and which culminated as he had predetermined. The evidence was amply sufficient upon which to base the instruction as to the felonious intent of the defendant at the time he shot and killed the deceased.

It remains to be considered whether or not there was evidence tending to prove that appellant voluntarily sought or invited the difficulty, or voluntarily and of his own free will engaged therein. This part of the instruction must find support, if at all, in the testimony of appellant himself. Without repeating that testimony as to what occurred in the office immediately preceding the tragedy, we must say that, after a careful examination of the record, we have not the least doubt that if deceased did assault appellant, as the latter testified; the accusations made by appellant; the demand for a letter of retraction or disclaimer; the threat to injure deceased in a business way; the allusion to the trouble between deceased and his brother; the evident anger of appellant in tapping his finger on the desk and accusing deceased of making false statements, together with many other circumstances, tend to prove that appellant voluntarily sought, invited and engaged in the

difficulty, and that the instruction properly submitted that phase of the case to the jury.

The criticism made in appellant's brief as to the form of instruction number 7, is fully answered by the decisions of this court in the cases of State v. Bailey, 190 Mo. 257, and State v. Dunn, 221 Mo. 530, in which the same question was before this court. In the Dunn case the instruction complained of was identical in form with instruction number 7 in this case. The instruction in form was then approved by this court, and nothing of value could now be added to what is there said upon the subject.

III. Complaint is made that the court erred in not permitting the defendant to explain his reason for being armed with a pistol on the occasion of the homicide.

It is competent for a defendant on trial for murder, to explain why he was carrying the deadly weapon by means of which the crime is alleged to have been committed. [State v. Heath, 221 Mo. 565.]

When objection was made by the circuit attorney to the question propounded to defendant as to why he carried a pistol, the court asked counsel for defendant if he proposed to show "that it was by reason of any relations with Jones," and in receiving a negative answer sustained the objection. It is not quite clear upon what ground the court based this ruling, for, as appellant contends, the very purpose of the testimony and the right of the defendant was to show that the weapon was not carried because of any relations with Jones, or because the defendant had anticipated the difficulty in which the weapon had been used to kill Jones.

While the defendant had the right to make the explanation, and it was error in the court to sustain an objection thereto, for the reason assigned, we cannot close our eyes to the fact that the defendant had given testimony, without objection, covering over two pages of the printed record, in explanation of his carrying

weapons for ten years, and why he carried them. In fact he had been asked the direct question, "Why did you carry it (pistol)?" and was permitted to answer without objection, and in his own way. It was not until he had been asked the same question a second time that the ruling complained of was made. Very few cases have come under our observation in which the defendant was given such latitude and went into such detail of explanation in order to ward off any sinister inference as to his possession of the deadly weapon at the time of the homicide, and we do not think it possible that the jury was uninformed as to defendant's contention that he was not carrying the weapon for the purpose of using it upon the deceased.

Entertaining these views, we hold that appellant was not prejudiced by the ruling of the court and that the error was harmless.

IV. It is finally urged that prejudicial error was committed in permitting the State to prove why appellant was discharged from his position as salesman for the company. Upon this contention the Attorney-General answers that the evidence was rendered competent because appellant had developed on cross-examination the fact that he had been discharged as such salesman, and that the reason for such discharge thereby became material in the case, and further that appellant failed to make a proper objection to the evidence to entitle him to have the ruling of the court thereupon saved for review upon appeal. Both of these contentions are controverted by appellant.

The question as to whether or not the Mill Company had good and sufficient reasons for discharging appellant from its service was clearly collateral to the issue on trial and should not have been injected into the case. But all that was brought out in the testimony thus objected to was the fact that appellant had not secured as much business for the company as it was

thought he should have done. There was no hint in this testimony of any reason for his discharge which in any manner reflected upon appellant's moral character. The jury knew he had been discharged; it was properly in evidence that appellant himself had said that "deceased had put him out" of the company. It would be taken as a matter of course that some reason or difference existed which caused the company to discontinue appellant's relations with it as salesman, and the reason given in the evidence objected to is so mild and colorless, so far as having any influence on the homicide is concerned, that we cannot find that its admission tended to prejudice the defendant upon his substantial rights.

Finding no reversible error in the record the judgment is affirmed. *Gantt, P. J.,* and *Burgess, J.,* concur.