**STATE of Missouri, Respondent,**

v.

**June Aaron SANDERS, Jr., Appellant.**

No. 37738.

Missouri Court of Appeals,
St. Louis District,
Division Four.

Aug. 30, 1977.

Daniel V. O'Brien, St. Louis, for appellant.

John D. Ashcroft, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, Courtney Goodman, Jr., Pros. Atty., Noel Robyn, Asst. Pros. Atty., Clayton, for respondent.

NORWIN D. HOUSER, Special Judge.

A jury convicted June Aaron Sanders, Jr., of second degree murder. Given a 20-year sentence, he has appealed, contending that the court erred in not giving an instruction on the imperfect right of self-defense, and that it was error to admit in evidence two photographs of the dead body of deceased because they were gruesome, inflammatory and prejudicial.

The court gave instructions on first and second degree murder, excusable homicide (accident), justifiable homicide (perfect self-defense), and Instruction No. 7 that if the jury did not find defendant guilty of first or second degree murder they should find him guilty of manslaughter upon a finding that defendant caused the death of Wilfred Smart by shooting and that his death was not justifiable or excusable homicide as those terms were defined in the other instructions.

Appellant asserts that Instruction No. 7 was not a complete exposition or definition of the law of manslaughter; that the jury should have been given an alternative other than murder or conventional manslaughter, in that appellant was entitled to a reduction of the offense to manslaughter upon a finding that although he provoked the difficulty or fight, in the course of which it became necessary to take the life of one of his adversaries in order to save his own life, appellant did so without any felonious intent or purpose on his part to kill or inflict serious bodily harm.

We have concluded that there was no error in failing to instruct on the imperfect right of self-defense.

A person charged with murder is entitled to complete exoneration on the ground of (perfect) self-defense if defendant did not provoke the use or threat of force against himself, and if defendant had reasonable cause to believe and did believe that he was in immediate danger of death or serious bodily harm and had reasonable cause to believe and did believe that it was necessary to take the life of his adversary in order to protect himself from such danger. Instruction No. 8, framed in the language of MAI–CR 2.40, so instructed the jury.

A person charged with murder is entitled to be acquitted of murder and to have the grade of the homicide reduced to manslaughter on the ground of imperfect self-defense if defendant wrongfully and unlawfully but without felonious intent to kill or do serious bodily harm provoked the use or threat of force against himself at the time of the killing, and if thereafter he had reasonable cause to believe and did believe that it was necessary to take the life of his adversary in order to protect himself from such danger. *State v. Partlow,* 90 Mo. 608, 4 S.W. 14 (1887); *State v. Parker,* 106 Mo. 217, 17 S.W. 180 (1891); *State v. Bailey,* 190 Mo. 257, 88 S.W. 733 (1905); *State v. Zorn,* 202 Mo. 12, 100 S.W. 591 (1907); *State v. Kretschmar,* 232 Mo. 29, 133 S.W. 16 (1910); *State v. Reeves,* 195 S.W. 1027 (Mo.1917); *State v. Harlan,* 240 S.W. 197 (Mo.1922); *State v. Creed,* 299 Mo. 307, 252 S.W. 678 (1923); *State v. Davis,* 268 S.W. 44 (Mo. 1924); *State v. Miller,* 307 Mo. 365, 270 S.W. 291 (1925); *State v. Dollarhide,* 333 Mo. 1087, 63 S.W.2d 998 (banc 1933); *State v. Smith,* 240 S.W.2d 671 (Mo.1951); Missouri Bar Committee Comments on Missouri Approved Criminal Instructions, Self-Defense, III Imperfect Self-Defense, pp. 77–89, by Judge Orville Richardson.

The shooting took place in Threaded Needle Tavern, in Kinloch, a tavern frequented by blacks. Herman Hudson, Jr., a black patron, had the barmaid call a taxicab. When the cab driver (a large white man named Robert McGuire) arrived he entered

the tavern and joined Hudson at the bar to have a beer. Appellant, a black person, seated on a stool at the end of the bar, observing McGuire's entrance, made a statement, loud enough to be heard by several people in the bar. There were various versions of exactly what appellant said. According to appellant, he said to the customer sitting next to him, "That white hunky [sic, "honky"?] must be crazy coming in this black bar like this. He would get killed in here." Appellant testified he did not intend to offend anyone by the word "honky"; that most people where he worked were white and "we use that [word] on the job"; that he did not think it made any difference where it was used. The barmaid testified that appellant said to McGuire, "Don't you know we don't allow hunkies [sic] or white people in this neighborhood after dark?" The barmaid testified that McGuire made no response to the statement; that he "just laughed." According to Hudson, appellant's statement was: "What is this hunky [sic] doing in here?" According to McGuire, appellant's statement was: "White boy, you're in a black tavern, you ain't got no business in here."

Appellant testified that the following happened after the remark was made: Hudson walked to the place where appellant was seated and said, "I called the cab," and thereupon struck appellant on the side of the head, knocking appellant's glasses off, and causing him to fall off the bar stool. Hudson struck the first blow, before appellant had a chance to say a word. Appellant managed to get to his feet. A scuffle ensued. Appellant was struck several times and went down. Wilfred Smart (later shot and killed) entered the fight. Hudson and Smart kicked and stomped appellant, who pulled himself up from the floor twice, made for the front door of the tavern and started outside. Someone grabbed him by the sweater and pulled him back and the fight resumed. The tussle went all the way to the open space of the dance floor, where the "fight really got on." Two or three people were beating appellant on the side of the head. He was kicked in the nose. His vision was affected. He sustained a broken nose and a broken toe. After the fight he was in a hospital for 10 days. Appellant was a special deputy and a licensed watchman. He was carrying a .38 calibre pistol loaded with six magnum bullets. He had a permit to carry this weapon. Toward the end of the fight Smart tackled appellant from the front, about the belt line, "like a football player." Dazed from the kick he received in the head, appellant managed to get his pistol out of the holster and that is when the gun went off. The gun discharged 3 times. Smart was wounded three times and died from gunshot wounds. When the fight began and as appellant was fighting with Smart in the lounge area, appellant was in fear of being beat up or killed.

Hudson's version: When McGuire entered the tavern appellant "started messing with him." By "messing with him" he meant "calling him names." Asked what appellant said, Hudson answered that he said, "What is this hunky [sic] doing in here?" Hudson, who was about three bar stools distant from appellant told appellant that he, Hudson, had called the cab and "it don't make no sense to mess with him." Appellant said, "Well, are you upholding for him?" They got to arguing. Hudson walked around "to where he was at" and hit appellant with his fist on the side of the jaw. Hudson admitted he struck the first blow. After that they fought, using their fists. Hudson was "punching." After the fight had continued for a while Hudson "let him go." Appellant grabbed Hudson and Hudson grabbed appellant, who called out to "another fellow" to bring him a pistol. When the other fellow did not do so appellant left the tavern, went to his car, leaned over the front seat on the driver's side, got a pistol, turned around, fired it into the air while yet on the outside of the tavern, then reentered the tavern, looking for his assailants. People scattered and ran out of the tavern. Wilfred was down on his knees, hiding under a table. Hudson was hiding in a corner, lying on the floor. Appellant walked over to the table where Wilfred was

down on his knees, referred to Smart in vulgar language and "shot down" at Smart while Smart was still on his knees. Hudson heard four shots inside the tavern.

According to the barmaid, Smart was on his knees, begging appellant not to shoot him but not touching appellant, when appellant discharged the pistol at Smart.

In general and indefinite language, without specifying how or in what way, appellant evidently contends that he provoked the difficulty which ultimately resulted in the homicidal act. By use of a quotation from *State v. Bailey*, 190 Mo. 257, 88 S.W. 733, 745 (1905), he implies that he committed the original wrong or assault. Appellant says, "The evidence as recited in the Statement of Facts displays at minimum the possibility of the issue of imperfect self-defense." From a quotation from *State v. Dollarhide*, 333 Mo. 1097, 63 S.W.2d 998 (banc 1933), he would draw an inference that he brought on or voluntarily entered into the fight or difficulty.

 The evidence does not support that implication or contention. Appellant made a statement to or concerning the cab driver. Hudson, taking umbrage at appellant's remark, initiated the action which followed: either an argument that lasted several minutes, or an immediate and unprovoked assault upon appellant. The fist fight between appellant and Hudson was precipitated by Hudson striking the first blow. Without any previous exchange of any kind between appellant and Wilfred Smart the latter entered the fight between appellant and Hudson. In the course of the fight between appellant on one side and Hudson and Smart on the other Smart kicked, stomped and tackled appellant who, in fear of his life, shot and killed Smart. In these circumstances appellant was not entitled to an instruction submitting the imperfect right of self-defense because he was not the wrongdoer or aggressor and there was no showing that appellant entered into the fight entertaining any unlawful purpose or that he brought on or provoked the difficulty between him and the victim of the homicide. The reduction in grade of

offense from murder to manslaughter is reserved for those guilty of original sin . . . those who provoke or bring on the difficulty or enter into the combat unlawfully or wrongfully. Appellant fails to qualify in these respects. Under appellant's testimony the only untoward thing he did was to make the "honky" remark, a racially oriented remark or reproach, addressing it to or concerning a white man for entering a black man's tavern. Appellant's remark was uncalled for, unfortunate, indiscreet, and could be considered provocative *from the viewpoint of the cab driver*, but however it may be characterized the remark was not wrongful or unlawful and there is nothing to indicate that it was uttered with intent to cause trouble of any kind with Hudson, or with Smart. Appellant had a right to say what he said in the exercise of his right of free speech, however impolitic or even foolish it may have been, with the attendant risk of insulting the cab driver. The cab driver, however, laughed and did not take the remark seriously. He left the tavern as soon as trouble started. The fight that followed upon the heels of appellant's "honky" remark was a fight between appellant and Hudson and did not involve Smart, the victim of the homicide, in any way until Smart injected himself into the fight. Appellant said nothing to Smart at any time, as far as this record shows, until just before the shooting when, according to state witnesses, he referred to Smart vulgarly. Appellant's "honky" remark did not provoke the difficulty between appellant and Smart. By the time Smart intervened and became a combatant the effect of appellant's racial slur against the cab driver had long since been dissipated. Appellant's "honky" remark, remote from the homicide, has no bearing on the question of imperfect self-defense.

Recapitulating, appellant was not in the wrong and was doing nothing unlawful at the commencement of the sequence of events eventually leading to the homicide. Appellant did not start the fight. The physical violence commenced when Hudson, the aggressor, struck the first blow. Hud-

son's aggression (not that of appellant or of the victim of the homicide) started the melee. After the fight had been in progress for a period of time Smart, according to appellant's testimony, entered the conflict on Hudson's side, kicking, beating and stomping appellant and finally tackling him, immediately before the fatal shots were fired, all the while putting appellant in fear of being beaten or of losing his life. There is nothing in this version of the facts entitling appellant to reduction of the grade of the homicide from murder to manslaughter. Appellant's act of killing Smart was either murder or justifiable homicide and the jury was properly so instructed.

■ Two color photographs of deceased's body, taken at the morgue, were marked as exhibits and admitted in evidence over the objection of appellant. They show the physiognomy of deceased, the clothing he was wearing and blood, cuts and marks on the face. One photograph shows what appears to be a bullet wound, or point of entry of a bullet, in the hairline above the right part of the forehead. While graphic, the exhibits are not gruesome in any prejudicial sense. They were properly admitted in evidence (1) for the purpose of identification; (2) to corroborate testimony that appellant "shot down" at deceased while the latter was on his knees, and (3) that the fight was a violent affair.

Affirmed.

SIMEONE, C. J., and ALDEN A. STOCKARD, Special Judge, concur.