COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Elder and Frank
Argued at Chesapeake, Virginia


KEVIN ALEXANDER CONNELL
                                                OPINION BY
v.    Record No. 2193-99-2          JUDGE ROBERT P. FRANK
                                           FEBRUARY 27, 2001
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF HENRICO COUNTY
             Buford M. Parsons, Jr., Judge Designate

          Christian L. Connell (Mays & Valentine,
          L.L.P., on briefs), for appellant.

          Steven A. Witmer, Assistant Attorney General
          (Mark L. Earley, Attorney General, on brief),
          for appellee.


     Kevin Alexander Connell (appellant) appeals his convictions

by a jury of second degree murder and use of a firearm in

commission of a murder.  On appeal, he contends the trial court

erred in:  1) refusing to grant his proffered jury instruction

on excusable homicide; 2) refusing to grant either of his

proffered jury instructions on imperfect self-defense; and 3)

refusing to instruct the jury on the lesser-included offense of

voluntary manslaughter in mutual combat.  For the reasons that

follow, we reverse the convictions.

## I.  BACKGROUND

In the early morning hours of January 7, 1998, Jon Lord (victim) was shot by appellant in the parking lot of the Hyatt Hotel in Richmond.

Judy Wiesler, a witness for the Commonwealth, testified she met the victim and Jeff Krupnicka on the evening of January 6, 1998 at the Hyatt Hotel in Richmond.  Then, Wiesler and the victim rode with Krupnicka to the Playing Field to get something to eat and play pool.  At the Playing Field, the three were sitting at a table when appellant sat down at the table.  None of the three knew appellant.  Appellant made fun of the victim's pastel-colored tie by saying it looked feminine and made the victim appear gay.  Wiesler testified that appellant's tone was sarcastic and insulting.  Appellant then commented in a sarcastic tone that Krupnicka had a Yankee accent and looked homosexual because of the earring in his ear.  Wiesler then left the table and went to play pool.  A couple of minutes later, Wiesler looked up and saw the victim throw appellant's pack of cigarettes on the floor.  Appellant then walked away from the table and left the Playing Field.  Wiesler said that she, the victim, and Krupnicka played pool after appellant left and "blew off" the incident.

Wiesler further testified that she, the victim, and Krupnicka left the Playing Field at 1:45 a.m. on January 7, 1998, and returned to the parking lot at the Hyatt Hotel.  At

the Hyatt Hotel, the victim and Wiesler exited Krupnicka's vehicle and started walking toward their parked cars. They noticed a four-wheel drive vehicle pull into the parking lot behind Krupnicka's car. Appellant got out of the four-wheel drive vehicle with a pistol in one hand and a shotgun in the other. Appellant started to walk toward Wiesler, the victim, and Krupnicka, yelling obscenities. Appellant had the pistol pointed down and the shotgun pointed up in the air. Appellant told Wiesler she was not going to get hurt and to walk away because she was not involved. Wiesler walked toward the street and was halfway across the street when she heard a shot. Wiesler testified she turned around and saw the victim holding appellant against the four-wheel drive vehicle. The victim had his hands around appellant's shirt collar. Appellant was still holding the shotgun. Wiesler heard more shots and started to walk back to the Hyatt parking lot. Appellant and the victim started struggling with each other and fell below Wiesler's line of sight. After hearing three more shots, Wiesler looked around the corner of a car and saw the victim lying on the ground. The victim was screaming that he had been shot, and appellant was standing over him with both guns in his hands. Appellant told the victim he was an idiot and he was going to have to take him to the hospital. Krupnicka drove his car up to appellant and hit appellant in the back of his legs, causing appellant to stumble forward. Appellant said Krupnicka was crazy and that

Wiesler was an idiot for hanging out with the victim and Krupnicka. Appellant then ran to his car and drove off.

Jeff Krupnicka testified that appellant approached him, the victim, and Wiesler at the Playing Field. Appellant made obscene remarks about the victim's and Krupnicka's neckties. Krupnicka testified that he and the victim responded with obscenities. Appellant lit a cigarette while sitting at the table with Krupnicka and the victim. The victim grabbed the cigarette out of appellant's mouth and threw it. More obscenities were exchanged. Then, appellant tried to light another cigarette. The victim took appellant's pack of cigarettes, crumpled them, and threw them. Appellant cursed Krupnicka and the victim and walked away.

Krupnicka testified he, the victim, and Wiesler left the Playing Field and returned to the Hyatt. The victim and Wiesler exited his car and he stood in the doorway of his car to say goodbye. At that time, appellant's vehicle pulled up behind Krupnicka's car. Krupnicka saw appellant walk toward the victim holding the pistol and the shotgun. As appellant walked, he began talking and lowered the shotgun. Krupnicka heard appellant say, "'I'm going to kill you.'" The victim lunged and tried to grab the shotgun. Krupnicka testified he saw the shotgun fire three times as the victim held it. The victim and appellant then started wrestling. Krupnicka returned to his car to call 911. Then, Krupnicka drove up behind appellant and hit

him in the back of the legs.  Appellant fell forward and then got in his vehicle and drove away.

Appellant testified he was playing pool in the Playing Field, when he first noticed Wiesler, the victim, and Krupnicka loudly having fun at a nearby table.  He testified that as he was leaving the Playing Field, he "noticed . . . the victim's [neck]tie and . . . actually paid him a compliment on it."  He testified that the victim responded, "I wear this tie to pick up faggots like you."  Appellant said he considered the comment humorously "in the manner [the victim] intended it" and sat at their table at their invitation.  He testified that after he introduced himself all three of the group introduced themselves to him.  They began a friendly conversation that later led to an argument.  Appellant testified he was intimidated and shocked when the victim threatened him.  After the victim pushed him, appellant paid his bill and drove home, where he had another alcoholic drink.  He then decided that he would "scare the hell out of [the group]" and "get an apology" from them.  He retrieved a rifle and a shotgun.  A handgun was already in his car.  He then returned to the Playing Field.

He waited for Krupnicka, the victim, and Wiesler to leave the Playing Field and he followed them to the Hyatt Hotel parking lot.  Appellant parked behind Krupnicka's car and got out of his vehicle.  He was carrying the shotgun and the pistol.  Appellant testified he walked to the front of his car and

demanded an apology from Krupnicka and the victim. Appellant testified that the victim then began to walk toward him. Appellant told Wiesler to leave, that she was not involved, and he did not want her to get hurt. Appellant testified he warned the victim to stay back. He tucked the pistol in his pants and then pointed the shotgun in the air to fire a warning shot over the victim's head. Appellant testified he never pointed the shotgun at the victim, did not say he was going to kill the victim, and did not walk toward the victim. The victim continued walking toward appellant and appellant fired a second warning shot and said, "'Stay back.'" Appellant realized the victim was not going to stop, so he turned to run and ran into the front of his car. The victim then grabbed appellant and appellant tossed away the shotgun. A struggle ensued between the two men. Appellant testified the victim put him in a headlock that included his left arm. The victim hoisted appellant into the air and told him he was going to kill him. The victim then dragged appellant around the side of appellant's vehicle. Appellant's feet were dragging across the ground and he did not have his weight under him. He stated that he "'was like a rag doll in [the victim's] hands.'" Appellant stated that it was at this point that he fired the shot into the victim's side, which ultimately resulted in the victim's death. The victim maintained his hold on appellant and appellant shot him in the right thigh. The victim fell to the ground and

appellant tried to get away from the victim. Fearing the victim
was going to grab the pistol, appellant shot him a third time in
the left shoulder. Appellant testified that he told the victim
he would not leave him and would get him to the hospital.
Appellant fled the scene after Krupnicka tried to run over him
with his vehicle.

The jury convicted appellant of second degree murder, a
lesser-included offense of the charge of first degree murder.

## II. ANALYSIS

> A defendant is entitled to have the jury
> instructed only on those theories of the
> case that are supported by evidence. Tuggle
> v. Commonwealth, 228 Va. 493, 508, 323
> S.E.2d 539, 548 (1984), vacated on other
> grounds, 471 U.S. 1096, 105 S. Ct. 2315, 85
> L.Ed.2d 835, aff'd on remand, 230 Va. 99,
> 334 S.E.2d 838 (1985); LeVasseur[v.
> Commonwealth], 225 Va. [564,] 590-91, 304
> S.E.2d [644,] 658-59 [(1983)]; Linwood Earl
> Briley v. Commonwealth, 221 Va. 532, 543,
> 273 S.E.2d 48, 55 (1980), cert. denied, 451
> U.S. 1031, 101 S. Ct. 3022, 69 L.Ed.2d 400
> (1981). The evidence to support an
> instruction "must be more than a scintilla."
> LeVasseur, 225 Va. at 590, 304 S.E.2d at
> 658; Hatcher v. Commonwealth, 218 Va. 811,
> 814, 241 S.E.2d 756, 758 (1978).

Frye v. Commonwealth, 231 Va. 370, 388, 345 S.E.2d 267, 280
(1986).

> "[T]he trial court should instruct the
> jury only on those theories of the case
> which find support in the evidence." Morse
> v. Commonwealth, 17 Va. App. 627, 632-33,
> 440 S.E.2d 145, 149 (1994). "'If any
> credible evidence in the record supports a
> proffered instruction on a lesser included
> offense, failure to give the instruction is

> reversible error.'  'Such an instruction, however, must be supported by more than a mere scintilla of evidence.'" _Brandau v. Commonwealth_, 16 Va. App. 408, 411, 430 S.E.2d 563, 564 (1993) (citations omitted).

_Goodson v. Commonwealth_, 22 Va. App. 61, 78, 467 S.E.2d 848, 857 (1996).

"On appeal, when the issue is a refused jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." _Lynn v. Commonwealth_, 27 Va. App. 336, 344, 499 S.E.2d 1, 4-5 (1998) (citing _Turner v. Commonwealth_, 23 Va. App. 270, 275, 476 S.E.2d 504, 507 (1996)), _aff'd_, 257 Va. 239, 514 S.E.2d 147 (1999).  Appellant first contends the trial court erred in failing to give the jury appellant's proffered instruction on excusable homicide.  We agree.

> Excusable self-defense may be asserted when the accused, who was at some fault in precipitating the confrontation with the victim, abandons the fight and retreats as far as he or she safely can . . . .  _See_ _McCoy v. Commonwealth_, 125 Va. 771, 776, 99 S.E. 644, 646 (1919).

_Lynn_, 27 Va. App. at 350, 499 S.E.2d at 7-8.

Once the accused abandons the attack and retreats as far as he or she safely can, he or she may kill his or her adversary if there is "a reasonably apparent necessity to preserve his [or her] own life or save himself [or herself] from great bodily harm." _Bailey v. Commonwealth_, 200 Va. 92, 96, 104 S.E.2d 28, 31 (1958).

Appellant's evidence established he provoked the violence in the hotel parking lot by following the victim, Krupnicka, and Wiesler to that location. He testified that he fired two warning shots over the victim's head when the victim began to advance toward him. He put the pistol on safety and tucked it into his pants. He also twice warned the victim to stay back. Then, he turned to run and ran into the front of his vehicle, which gave the victim the opportunity to catch him. This testimony established more than a mere scintilla of evidence that appellant retreated as far as possible before the victim apprehended him. At this point, appellant tossed his shotgun away. We believe this testimony established more than a mere scintilla of evidence that appellant abandoned the fight.

The victim was 6'1" tall and weighed over 200 pounds, while appellant is 5'6" tall and weighs 180 pounds. Appellant testified the victim hoisted him into the air and told him he was going to kill him. The victim headlocked appellant and dragged appellant. Appellant testified that the victim again told him he was going to kill him. Appellant said he did not have his weight under him and "was like a rag doll in [the victim's] hands." Appellant also testified he was fearful the victim would shoot him with the shotgun. At this point, appellant fired the fatal shot into the victim's side with the pistol. This evidence provided more than a scintilla of

evidence that appellant killed the victim out of a reasonably apparent necessity to preserve his own life, and was sufficient to support an instruction on excusable homicide. Therefore, we find the trial judge erred in refusing to instruct the jury on excusable homicide. We reverse appellant's convictions and remand for a new trial if the Commonwealth be so advised.

### III.

Appellant next contends the trial court erred in refusing to grant either of appellant's proffered jury instructions on imperfect self-defense. Appellant argues that the jury should have been instructed on imperfect self-defense because there was more than a scintilla of evidence that he displayed the firearms without an intent to kill or do serious bodily harm and that he shot the victim only because he reasonably feared he would suffer serious bodily harm. We disagree.

Appellant argues the refused instruction would have mitigated the malice necessary for a murder conviction to manslaughter. Appellant cites authority from other states in support of his argument. The cases cited by appellant liken imperfect self-defense to voluntary manslaughter committed in the heat of passion. See People v. Heflin, 456 N.W.2d 10, 22 n.22 (Mich. 1990); State v. Faulkner, 483 A.2d 759, 761 (Md. 1984); State v. Sanders, 556 S.W.2d 75, 76 (Mo. Ct. App. 1977); Reed v. State, 11 Tex. App. 509, 519 (Tex. Ct. App. 1892); State v. Partlow, 4 S.W. 14 (Mo. 1887).

In this case, the trial court instructed the jury on the definitions of malice, heat of passion, first degree and second degree murder, and voluntary manslaughter in the heat of passion. The trial court also granted an instruction explaining that malice distinguishes murder from manslaughter.

Appellant also relies upon Hash v. Commonwealth, 88 Va. 172, 13 S.E. 398 (1891), to support his argument that imperfect self-defense is a doctrine recognized by Virginia law. Appellant concedes, however, that Hash is the only Virginia case that discusses "imperfect defense."

If we interpret the discussion of "imperfect defense" in Hash for the proposition that one can provoke a confrontation and still avail himself or herself of the defense of justifiable homicide, such holding was overruled by Jackson v. Commonwealth, 98 Va. 845, 36 S.E. 487 (1900). However, if we interpret Hash to hold that one may avail himself or herself of "imperfect defense" if he or she provoked an attack without felonious intent, such holding merely is the law of voluntary manslaughter as it currently stands in the Commonwealth. Further, the trial court instructed the jury on voluntary manslaughter, heat of passion, and the distinction between murder and manslaughter. We, therefore, find the trial court did not err in denying appellant's proffered jury instructions on imperfect self-defense.

IV.

Finally, appellant contends the trial court erred in refusing his request to instruct the jury on the lesser-included offense of voluntary manslaughter by mutual combat. We disagree.

"For combat to be 'mutual,' it must have been voluntarily and mutually entered into by both or all parties to the affray." Lynn, 27 Va. App. at 356, 499 S.E.2d at 10 (citing Smith v. Commonwealth, 17 Va. App. 68, 72, 435 S.E.2d 414, 417 (1993)). "'One who is assaulted may and usually does defend himself, but the ensuing struggle cannot be accurately described as a mutual combat.'" Smith, 17 Va. App. at 72-73, 435 S.E.2d at 417 (quoting Harper v. Commonwealth, 165 Va. 816, 820, 183 S.E. 171, 173 (1936)).

Appellant's evidence established that when the victim began walking toward him in the hotel parking lot, appellant warned the victim to stay back, fired two warning shots over the victim's head, and told the victim, "Stay back." When it became clear that the victim was still advancing, appellant tried to run away but ran into the front of his car. At that point, the victim grabbed appellant.

The record does not contain a scintilla of evidence that the fight between appellant and the victim was mutual combat. Appellant's evidence showed that he was attacked by the victim, which, under Smith, does not constitute mutual combat. We,

therefore, find the trial court did not err in refusing appellant's request for a jury instruction on mutual combat.

For these reasons, we affirm the trial court's refusal to instruct the jury on imperfect self-defense and mutual combat, but we reverse appellant's convictions based on the trial court's refusal to instruct the jury on excusable homicide and remand for further proceedings if the Commonwealth be so advised.

<u>Reversed and remanded.</u>

Benton, J., concurring and dissenting.

I concur in Part I, Part II, and Part IV of the majority opinion. Therefore, I would also reverse the convictions and remand for a new trial. I dissent from Part III, however, because I believe the doctrine of imperfect self-defense was available to Kevin Alexander Connell and required the trial judge to give the jury a separate, additional instruction regarding voluntary manslaughter.

In Virginia, "manslaughter is a common law offense." Blythe v. Commonwealth, 222 Va. 722, 725, 284 S.E.2d 796, 797 (1981). The common law traditionally recognized a circumstance in which a "'killing in self-defen[s]e will be manslaughter only.'" Hash v. Commonwealth, 88 Va. 172, 194, 13 S.E. 398, 405 (1891) (citation omitted). This common law doctrine is generally called "the imperfect right of self-defen[s]e." Id. at 193, 13 S.E. at 405. The Supreme Court has described the doctrine as follows:

> Here is a clear recognition of the doctrine that, although the slayer provoked the combat, or produced the occasion, yet, if it was done without any felonious intent, the party may avail himself of the plea of self-defen[s]e. . . . "Indeed the assertion that one who begins a quarrel or brings on a difficulty with the felonious purpose to kill the person assaulted, and accomplish[es] such purpose, is guilty of murder, and cannot avail himself of the doctrine of self-defen[s]e, carries with it in its very bosom the inevitable corollary that if the quarrel be begun without a felonious purpose, then the homicidal act

> will not be murder. To deny this obvious
> deduction is equivalent to the anomalous
> assertion that there can be a felony without
> a felonious intent; that the act done
> characterizes the intent, and not the intent
> the act."

Id. at 194-95, 13 S.E. at 405-06 (citations omitted).[1]

Five years after Hash, the United States Supreme Court cited several common law treatises for the proposition that "where the accused embarks in a quarrel with no felonious intent, or malice, or premeditated purpose of doing bodily harm or killing, and under reasonable belief of imminent danger he inflicts a fatal wound, it is [manslaughter,] not murder." Wallace v. United States, 162 U.S. 466, 471 (1896). Applying that principle, the Court observed the following:

> Granting that the jury would have been
> justified in finding that [the accused's]
> intention in going for the gun and returning
> with it as he did was to inflict bodily harm
> on [the deceased] if he did not leave, still
> the presumption was not an irrebuttable one,
> and it was for the jury to say whether [the
> accused's] statement that he procured the

---

[1] The Court's later decision in Jackson v. Commonwealth, 98 Va. 845, 36 S.E. 487 (1900), did not abolish the doctrine of imperfect self-defense. Jackson was primarily concerned with the propriety of the trial judge giving a justifiable homicide instruction. Approving that action, the Court noted that the justifiable homicide instruction "did not instruct the jury, nor was it intended to instruct them, upon the degree of the prisoner's guilt, whether it was murder or manslaughter, but it was merely intended to tell them that, upon the facts hypothetically stated in the instruction, the prisoner was not entitled to an acquittal." Id. at 848, 36 S.E. at 488. Thus, I do not disagree with the majority opinion's observation that Jackson did not eliminate the common law doctrine of imperfect self-defense.

> gun only for self protection was or was not
> true. And if they believed from the
> evidence that this was true, and that the
> killing was under reasonable apprehension of
> imminent peril, then it was for the jury to
> determine under all the facts and
> circumstances whether [the accused] had
> committed the offense of manslaughter,
> rather than that of murder, if he could not
> be excused altogether.

Id. at 477.

Several other states continue to recognize this common law doctrine. For example, the North Carolina Supreme Court has described the doctrine as follows:

> [I]f defendant believed it was necessary to
> kill the deceased in order to save herself
> from death or great bodily harm, and if
> defendant's belief was reasonable in that
> the circumstances as they appeared to her at
> the time were sufficient to create such a
> belief in the mind of a person of ordinary
> firmness, but defendant, although without
> murderous intent, was the aggressor in
> bringing on the difficulty, or defendant
> used excessive force, the defendant under
> those circumstances has only the imperfect
> right of self-defense, having lost the
> benefit of perfect self-defense, and is
> guilty at least of voluntary manslaughter.
>
> An imperfect right of self-defense is
> thus available to a defendant who reasonably
> believes it necessary to kill the deceased
> to save himself from death or great bodily
> harm even if defendant (1) might have
> brought on the difficulty, provided he did
> so without murderous intent, and (2) might
> have used excessive force.

State v. Mize, 340 S.E.2d 439, 441-42 (N.C. 1986) (quotation marks and citations omitted). See also Swann v. United States, 648 A.2d 928, 933 (D.C. 1994); State v. Faulkner, 483 A.2d 759,

761 (Md. 1984); State v. Sanders, 556 S.W.2d 75, 76 (Mo. Ct. App. 1977).

The jury absolved Connell of willful, deliberate, and premeditated conduct by finding him not guilty of first degree murder but guilty only of second degree murder.  See Code § 18.2-32.  Thus, we can reasonably conclude that the jury may have accepted some portion of Connell's testimony that he armed himself and returned to "scare" the victim and to seek an "apology."  In any event, when we view this evidence in the light most favorable to Connell, see Martin v. Commonwealth, 13 Va. App. 524, 526, 414 S.E.2d 401, 401 (1992), we must conclude that the jury could have found Connell's testimony to be germane to Connell's claim of imperfect self-defense.

I disagree with the majority opinion's holding that the manslaughter instruction the trial judge gave the jury was sufficient to encompass the theory of imperfect self-defense. The instruction on voluntary manslaughter was premised upon a finding by the jury of "sudden heat of passion."  The instruction Connell tendered in support of the theory of imperfect self-defense would have permitted the jury alternatively to find voluntary manslaughter even if the jury found that Connell did not act in "sudden heat of passion." Connell's instruction would have allowed the jury to find him guilty of voluntary manslaughter if the jury found that he "believed it to be necessary to kill" Jon Lord "to save himself

from death or great bodily harm" and that his belief was "reasonable."  If the jury believed that Connell had initiated the altercation without felonious intent, it could have found voluntary manslaughter under the theory of imperfect self-defense, without regard to any finding of sudden heat of passion.  Neither Hash nor the other authorities that discuss the theory of imperfect self-defense require proof of sudden heat of passion.

In Swann, the District of Columbia Court of Appeals rejected the government's argument that the general manslaughter instruction was sufficient and that "heat of passion" encompasses the "fear" or "terror" found in a claim of imperfect self-defense.  See 648 A.2d at 931-32.  I believe the court's discussion is persuasive.

> While [the government's] argument is not without force, we think that an imperfect self-defense claim must be viewed through a different prism.  Unlike other aspects of provocation, which can only reduce a homicide to manslaughter, a state of mind arising out of a self-defense situation justifies outright exoneration if reasonable.  Because the subjective state of mind required for an imperfect self-defense claim is identical to that required for a true self-defense claim, we can find in the controlling authority no suggestion that an actual, albeit unreasonable, belief that one's life is in danger cannot serve as a mitigating factor justifying a voluntary manslaughter instruction where also coupled with an actual belief that the force used was necessary in self-defense.  Thus, however the emotions of fear and terror unrelated to self-defense may relate to

> mitigation of second-degree murder where the killing was provoked or the defendant acted in the heat of passion, we think that analysis cannot be controlling on the distinct issue of a killing committed in the actual but unreasonable belief that the defendant is in mortal danger.  While fear and terror may be a consequence of that situation, the motivation for the killing stems from the actual, albeit unreasonable, perception of imminent danger to one's life, and the mitigation issue where a self-defense claim is involved is measured by the actual presence of <u>that</u> state of mind.

<u>Swann</u>, 648 A.2d at 932.[2]

For these reasons, I would hold that the evidence was sufficient to support an instruction to the jury under both manslaughter principles and that the trial judge erred in refusing the instruction concerning the claim of imperfect self-defense.  Accordingly, I would remand with the additional direction that Connell is entitled to an instruction on imperfect self-defense on retrial, if the evidence supports it.

---

[2] The District of Columbia applies the common law rule even when the accused has an actual, albeit unreasonable, belief that his or her life is in danger.  The <u>Hash</u> Court did not state explicitly whether it required a reasonable belief on the part of the accused to justify an imperfect self-defense instruction.  It limited its discussion to the intent with which the accused entered the deadly encounter.  <u>See</u> 88 Va. at 195, 13 S.E. at 406 (limiting the accused's culpability to "the intention with which the occasion was brought about" instead of the reasonableness of belief in danger).  In this case, however, Connell requested an instruction predicated on the jury finding his belief in the necessity of killing the victim reasonable.  Regardless of these distinctions in the doctrine, <u>Swann</u> demonstrates that imperfect self-defense encompasses a type of voluntary manslaughter clearly distinct from the voluntary manslaughter arising from the sudden heat of passion.